**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **JOHN DOE** | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO. 2:21-cv-257** |
| **TEXAS A&M UNIVERSITY-** | § | **JURY** |
| **KINGSVILLE & MARK HUSSEY** | § | |
| *in his official capacity as President* | § | |
| *of* **TEXAS A&M UNIVERSITY-** | § | |
| **KINGSVILLE** | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

NOW COMES Plaintiff, John Doe[1] (hereinafter "Doe" or "Plaintiff"), filing this his *Plaintiff's Original Complaint*, complaining of Texas A&M University-Kingsville and Mark Hussey *in his official capacity as President of* Texas A&M University-Kingsville (hereinafter "Defendant" or "University") and showing in support thereof as follows:

### I.   INTRODUCTION

1.      This is an action for damages and injunctive relief to prevent Defendant from causing irreparable harm to Doe by separating him from his education. It arises from the actions taken, and procedures used, by the University and its agents and/or employees in connection with a disciplinary proceeding initiated against Plaintiff, a male junior, concerning an unsupported allegation of sexual assault made by (fellow student) Roe, and the sanctions that the University has imposed as a result of that flawed proceeding and its procedural irregularities which all resulted in an erroneous outcome.

---

[1] Due to the nature of the allegations in this lawsuit, Plaintiff is proceeding under the pseudonym "John Doe" and identifies his accuser as "Jane Roe." Plaintiff identifies other Texas A&M University-Kingsville students by their initials. Plaintiff is simultaneously filing his *Plaintiff's Motion to Proceed Under a Pseudonym*, with this complaint.

2.      The University's hearing officer treated Roe and Doe's testimony differently on the basis of gender. The hearing panel concluded that consent for the sexual acts was not obtained due to the level of intoxication of the complainant. The evidence used to support that finding is inconsistent, inconclusive and did not support that decision because it was not at all apparent to Doe that Roe was "incapable of providing consent."

3.      The panel failed to make any finding that Roe was "incapacitated," as defined by the University rules,[2] nor was there any evidence that Roe's alleged "incapability of providing consent" was readily apparent to Doe. Per the University's policy, intoxication does not negate consent only "incapacitation" does.

4.      The small amount of alcohol Roe drank in Doe's presence during the several hours (about four and one-half hours) they spent together – 50 milliliters (one "shot") of liquor (possibly vodka)[3] and three Smirnoff Ice[4,5], could not have rendered her incapacitated, impaired and/or unable to provide consent.

5.      In the University's report that was admitted into evidence at the hearing,[6] Roe's friend, X.S., states she had previously seen Roe drink five to six shots of Hpnotiq[7] which resulted in Roe being "in a good mood," but she was able to handle that alcohol intake.[8] On cross-examination, Doe's counsel was completely blocked from asking Roe any questions – AT ALL – about alcohol – how often she uses alcohol, how many times she had previously consumed alcohol, her habits

---

[2]  *See* Exhibit 1 ("Final Draft Report"), pp. 21-50. Contained within the Final Draft Report are Texas A&M's system-wide regulations, specifically pp. 21-50 refer to Rule 08.08.01 Civil Rights Compliance.

[3]  Vodka is 40% alc/vol; https://drinklively.com/what-proof-is-vodka/

[4]  Smirnoff Ice is 4.5% alc/vol; https://drizly.com/beer/specialty-beer-alternatives/malt-liquor/smirnoff-ice-original/p4696
https://alcoholvolume.com/smirnoff-ice-alcohol-content-percentage/

[5]  The University's report inaccurately states that Smirnoff Ice is 5% alc/vol, citing to Smirnoff's website which does not actually publish any alcohol content for any of its products. *See* Exhibit 1, p.5.

[6]  *See generally* Exhibit 1.

[7]  Hpnotiq is 17% alc/vol; http://www.hpnotiq.com/

[8]  *See* Exhibit 1, p.5, ¶ 4.

2

regarding consumption of alcohol, and – ESPECIALLY – whether she consumed alcohol *before* meeting-up with Plaintiff on the night in question.[9]

6.      Roe – who testified that she was intoxicated – also testified that she did not want to have sex with Doe. While Doe – who was not intoxicated – testified that Roe fully consented. The University's hearing officer treated Roe and Doe's testimony differently on the basis of gender.

7.      The hearing officer found Doe responsible for sexual assault and expelled him from the University based on a record that was:

   a.   devoid of evidence that Roe did not give affirmative consent before and during the sexual encounter;

   b.   devoid of evidence of Roe's intoxication rising to the level of incapacitation; and

   c.   devoid of evidence that Roe's alleged incapacitation would have been apparent to a sexual partner.

8.      When the degree of doubt about the reliability of a disciplinary proceeding passes from articulable to grave, the merits of the decision itself can support an inference of sex bias, which resulted in an erroneous outcome.

## II.      JURISDICTION AND VENUE

9.      The Court has federal question jurisdiction under 28 U.S.C. § 1331, because Doe's claims arise under federal law, namely Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq*.

10.     The Court has supplemental jurisdiction over John Doe's state law claims under 28 U.S.C. § 1367, because those claims are so closely related to his federal law claim as to form the same case or controversy under Article III of the United States Constitution.

---

[9] While the hearing was recorded in its entirety, Plaintiff and his counsel – to date – are not allowed access to the transcript/recording.

11.     This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391. The defendant university's principal place of business is within this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

### III.     PARTIES

12.     At all material times, John Doe resided within this judicial district, the Southern District of Texas, while attending Texas A&M University-Kingsville.

13.     Defendant Texas A&M University-Kingsville is a general academic teaching institution pursuant to Section 61.003 of the Texas Education Code. Defendant may be served by and through its President, Mark Hussey, at the Office of the President, 1050 West Santa Gertrudis, Memorial Student Union Building Room 136, Kingsville, Texas 78363.

### IV.     STATEMENT OF FACTS

14.     Whenever in this complaint Plaintiff pleads that Defendant engaged in an act or omission, Plaintiff likewise pleads that Defendant, its officers, agents, servants, employees or representatives, engaged in said act or omission in the course and scope of employment and/or with the full authorization or ratification of Defendant.

15.     Doe and Roe began messaging one another via social media app, Twitter, on or about May 2020. Between May 2020 and September 2020, the two messaged frequently and began to build a relationship. In fact, in or about July 2020, Roe even introduced Doe to her family, who liked him and thought he was cool.[10]  One of Roe's family members even assumed the two were sexually active and asked Doe how many bagels he could place on his erect penis.[11]

---

[10]  *See* Exhibit 1, p. 73
[11]  *See* Exhibit 1, pp. 73-74

16.     Roe was also very outspoken to Doe about her frequent use of alcohol.[12]  It was, therefore, not surprising to Doe that on September 1, 2020, Roe accepted his invitation to hang out and drink alcohol at his place.[13] On that date, Doe and Roe made a plan to hang-out at his place where they both agreed they would drink alcohol. Roe told Doe ahead of time that she does not "drink and drive" and asked Doe to pick her up because she knew she would be drinking alcohol. When Doe picked-up Roe, he offered her a shot of alcohol (possibly vodka) which she accepted and drank. When the pair got back to Doe's apartment – over about four and one half hours – they shared a six-pack of Smirnoff Ice, both drinking three. Doe added a bottle cap of moonshine to each of his. Doe testified that at no point during the evening did Roe slur her speech or need any assistance walking. The only difference Doe testified that he saw in Roe's conduct was that she was more honest and candid in their conversation.

17.     At some point, Doe playfully spanked Roe – who didn't tell Doe to stop, nor did she give him any verbal or non-verbal cues that she was uncomfortable. When Doe then placed his hand on Roe's thigh she didn't react adversely and the two began to have sex on the couch, with Roe on top. The couple then decided to go into the bedroom where they both walked together – again Roe walking on her own without needing any assistance. The couple continued having consensual sex in the bedroom and afterwards, Roe went to the restroom where she apparently vomited and called her friends to pick her up. After exiting the restroom, Roe – who did not appear at all upset to Doe – gathered her belongings and left Doe's apartment, without expressing any contention or concerns.

---

[12] *See* Exhibit 1, pp. 76, 77, 82.
[13] *See* Exhibit 1, pp. 84-85.

18.     Although the alleged "sexual misconduct" took place on September 1, 2020, it was not until March 23, 2021 – almost seven months later – that Roe filed a complaint with the University. In the interim, a criminal investigation was launched which resulted in a *No-Bill* by the grand jury.

19.     On September 16, 2021 a *Zoom* hearing was held by a three-member panel, which lasted approximately five hours. Said proceedings were so flawed that Plaintiff cannot fathom a court would find a semblance of *due* process within them. Plaintiff's main concerns with the proceedings are (but not limited to) the following:

1)     that the accusations against Plaintiff were taken as true and that the burden (a term left "un-defined" during the process) of *disproving* same was made his – in violation of the University's own policy;[14]

2)     that, after securing counsel immediately before the hearing, Plaintiff was not allowed an extension of time to consult, gather evidence (such as phone records, police reports, the *No Bill* from the Grand Jury, statements provided to law enforcement, etc…) and/or consult with experts to confront the evidence asserted against him;

3)     that Plaintiff was not allowed to present any evidence to the University "investigators" during the investigation and/or that any such evidence Plaintiff tried to present was refused by the investigators;

4)     that neither Plaintiff nor the panel was provided with any of the recorded statements – recorded by the University investigators – of Doe, Roe or any of the witnesses in the case;

5)     that Plaintiff's unsigned "statement" was offered into evidence as part of the record despite Plaintiff's testimony that the statement was inaccurate – although Plaintiff was

---

[14] *See* Exhibit 1, pp. 37-38; University Rule 4.2.10 (b).

not allowed to testify how or why. Further, the recordings – that were not allowed into the record – of Plaintiff's actual statement did not comport with the statement prepared by the University;

6) that Plaintiff's counsel was not allowed to provide any argument/statement on his behalf;

7) that Plaintiff was not allowed (through his counsel or otherwise) to object to any questions or queries in the case by the panel;

8) that reports of "suspected" or asserted alcohol levels – which were completely made-up by the University – were allowed into the record without any actual evidence, support-in-fact and without any sponsor of same;

9) that nearly every question asked concerning the potential bias of the witnesses, the context within which the events occurred and/or the (wholly inaccurate) information included within the "packet" were not allowed;

10) that every question concerning the complainant's alcohol consumption, sexual proclivity and/or bias were disallowed entirely; *and*

11) that there was absolutely no allowance to secure the obvious evidence which was requested by Plaintiff and/or the panel members for the purpose of having a true hearing on the accuracy and context of the allegations before ending the career and education of a young man.

20.    Plaintiff asserts that the above-noted procedural irregularities significantly and erroneously impacted the outcome in that they mandated a "one-sided" process directed at allowing whatever supports Roe's allegations into the "record" and disallowing or ignoring evidence to the contrary,

in violation of Doe's *due process* rights and/or under the concept of fundamental fairness in adversarial proceedings.

21.     Plaintiff asserts that additional evidence – which is in the care of the University and available to the "investigators" involved herein, but not to Plaintiff – concerning the *No Bill* of his criminal case and/or concerning the previous testimony/statements of witnesses – prevented the panel from being provided with a clear picture of the actual context and contrary statements made and relied upon by the Grand Jury that *No Billed* Plaintiff.

22.     Plaintiff asserts that either in compliance with official mandates to "crack down" on those accused of sexual misconduct and/or in an effort to appease the "me too" movement and supporters of same (as opposed to the more constitutional "deciding a case on the individual facts movement"), the Title IX Coordinator, investigators (in particular), and decision-makers (who do not even issue their own opinion or decision) had a bias for Roe and against Doe, and that such bias permeated the investigation, the allowed (and disallowed) evidence which significantly impaired the decision making and resulted in an erroneous outcome.

23.     Plaintiff asserts that given the above-noted procedural irregularities, the belated complaint, the criminal dismissal, the lack of supporting medical documentation, photos or the like, and the conduct of *all* involved (including Roe discussing with Doe and her family sex, how many bagels could be placed on Doe's penis and the like) – all showing consent and a plan for consensual sex regardless of whether or not alcohol was involved – the expulsion of Doe (who has no prior discipline or complaints) was inappropriate and/or too severe, resulting in an erroneous outcome.

24.     On, October 6, 2021, Doe was expelled from the University based on the decision of the hearing panel finding him responsible for committing "Sexual Assault."[15]  The panel concluded

---

[15]  After Plaintiff filed an appeal, on October 28, 2021, the University affirmed the Panel's findings. As of the date of the filing of this Complaint, Plaintiff is still enrolled in his classes. This action, *inter alia*, seeks to enjoin the University

that consent for the sexual acts was not obtained because the level of intoxication of Roe made her incapable of providing consent, and that Doe knew or reasonably should have known about Roe's inability to provide consent.[16]  The panel also concluded that Roe indicated that she stated verbally that she did not want to have sex with the Doe even though her testimony was wholly inconsistent with Doe's. In its decision, the panel failed to make any finding that Roe was "incapacitated," as defined by the University rules,[17] nor was there any evidence presented that Roe's alleged "incapability of providing consent" was readily apparent to Doe. Per the University's policy, intoxication does not negate consent, only "incapacitation" does.

25.     The University, like most every school in the country, does not punish all, or even most, drunken sex. Under the University's Sexual Misconduct Policy, intoxication negates consent only when it reaches a level of "incapacitation," which the policy defines as "a state in which a person, due to a disability, the use of alcohol or drugs, being asleep, or for any other reason, is not capable of making rational decision about consent to sexual activity and recognizing the consequences of their decision."[18]

26.     The University defines "consent" as a "clear, voluntary and ongoing agreement to engage in a specific sexual act. Persons need not verbalize their consent to engage in a sexual act for there to be permission. Permission to engage in a sexual act may be indicated through physical actions rather than words. A person who is asleep or mentally or physically **_incapacitated_**, either through the effect of drugs or alcohol or for any other reason, or whose agreement was made by threat,

---

from effectuating its decision to expel Plaintiff. *See also* Exhibits 2 (Panel Decision) & 3 (Appeal Decision).
[16]  *See* Exhibit 2 – Panel Decision.
[17] *See* Exhibit 1, pp. 21-50.
[18] *See* Exhibit 1, p. 25.

coercion, or force, **cannot give consent**. Consent may be revoked by any party at any time. (**emphasis added**).[19]

27.      In reaching its decision, the panel completely ignored Doe's testimony and/or evidence contradictory to the allegations. The Panel chose to consider and believe only the testimony of Roe. The Panel also completely blocked Doe's counsel from asking Roe any questions – AT ALL – about alcohol – how often she uses alcohol, how many times she had previously consumed alcohol, her habits regarding consumption of alcohol, and – ESPECIALLY – whether she consumed alcohol *before* meeting-up with Plaintiff on the night in question. The small amount of alcohol Roe drank in Plaintiff's presence during the several hours (about four and one-half hours) they spent together could not possibly have rendered her incapacitated, pursuant to the University's rules. Even if that small amount of alcohol could have rendered Roe "intoxicated" it could not have supported the panel's conclusion that Doe should have concluded that Roe was *incapacitated*.

28.      In the University's report that was admitted into evidence at the hearing, Roe's friend, X.S., states she had previously seen Roe drink five to six shots of Hpnotiq[20] which resulted in Roe being "in a good mood," but she was able to handle that alcohol intake.[21]

29.      The University even went to the trouble of creating its own *after-the-fact* "Blood Alcohol Calculator (BAC) estimates" which seems to track the alcohol consumption of the pair over a timeline that does not comport with any of the testimony, and is based on an alcohol content level of Smirnoff Ice that the University completely made up.[22]

30.      On one level (the most important one), the decision is completely shocking. Not only did it violate the Policy's clear definition of "incapacitation," but there was no testimony at the hearing

---

[19]  *Id*.
[20]  Hpnotiq is 17% alc/vol; http://www.hpnotiq.com/
[21]  *See* Exhibit 1, p.5, ¶ 4.
[22]  *See* Exhibit 1, pp. 86-98.

that Roe was actually incapacitated in the first place, and Roe gave demonstrably contradictory testimony that dramatically undermined her credibility. Additionally, Roe's friend testified that she had been present previously when Roe drank far more than she reported she drank on the night of September 1, 2021 – five to six shots of Hpnotiq – and said she was simply in a good mood because she could handle that level of alcohol consumption.

31.     On another level, the decision unfortunately comes as no surprise at all. Roe is a female student accusing a male student of sexual assault at Texas A&M University-Kingsville. And the University's regime for investigating and adjudicating claims of sexual misconduct is rife with gender bias. It was all but inevitable that Doe would be found responsible. The panel took Roe's testimony as true and placed the burden of *disproving* the allegations with Doe, in violation of its own policies.[23] The panel found Doe responsible only by ignoring and disregarding its clear definition of "incapacitation" and the obvious problems with Roe's credibility, which proves that other forces were at work. Doe was found responsible, and expelled, because of gender bias.

32.     The panel's decision has destroyed Doe's future and caused him severe emotional distress. It also violated Doe's common law and statutory rights. Doe now comes to this Court for redress.

### TEXAS A&M'S SEXUAL MISCONDUCT POLICY

33.     The Texas A&M University System has implemented system-wide policies to comply with the Title IX rules promulgated by the Department of Education. Those system-wide policies, operate as a contract between the students attending the University and the University itself.

34.     Texas A&M University System Regulation 08.01.01, "Civil Rights Compliance," does not differentiate between employees, with whom the school has employment contracts, and students, who have accepted a contract to attend the school.[24]

---

[23] *See* Exhibit 1, pp. 37-38; University Rule 4.2.10 (b).
[24] *See* Exhibit 1, pp. 21-50.

35.    The regulation states: "Each member chief executive officer (CEO) has the primary responsibility for ensuring compliance with civil rights laws and related system policy. The CEO must designate a contact person(s) responsible for overseeing its civil rights protections program. This person(s) will ensure that all complaints of discrimination are promptly, thoroughly, and equitably investigated and resolved in accordance with this regulation. The designee(s) will periodically follow up on situations in which discrimination is found to ensure that the situation does not reoccur. Members must designate at least one Title IX Coordinator, who may or may not be the same employee designated (in 1.1) above. Members must notify applicants for admission and employment, students, parents or legal guardians of elementary and secondary school students, and employees of the name or title, office address, electronic mail address, and telephone number of the employee(s) designated as the Title IX Coordinator(s). The notification should also state that the member does not discriminate on the basis of sex in its education programs and activities, including admission and employment, in accordance with Title IX of the Educational Amendments of 1972 and its implementing regulations. The contact information for the Title IX Coordinator(s) must be prominently displayed on the member's website and in each handbook or catalog that it makes available to persons entitled to notification as listed above. Members receiving an inquiry or a charge of discrimination from a local, state or federal agency must immediately inform the System Ethics and Compliance Office (SECO) which will, in coordination with the System Office of General Counsel (OGC), serve as the liaison between the member and the agency."[25]

36.    Dr. Hussey, as the Texas A&M University-Kingsville president, is responsible for designating the Title IX Coordinator, who is responsible for the implementation, enforcement, and coordination of Title IX and the related university policies and University rules.

---

[25] *See* Exhibit 1, pp.28-29; Rule 08.08.01 §1 (in part).

37.     Title IX applies to complaints of sexual harassment, sexual assault or domestic violence, dating violence, or stalking based on sex at member institutions of higher education only: (a) Complaints will be processed under Title IX if all of the following apply: (i) The member has actual knowledge of a notice of sexual harassment or a complaint involving allegations of sexual harassment, sexual assault, and/or dating violence, domestic violence, and stalking based on sex to the member's Title IX Coordinator or any member official who has authority to institute corrective measures on behalf of the member. Imputation of knowledge based solely on vicarious liability or constructive notice is insufficient to constitute actual knowledge. Each member must designate in its rule which employees have the authority to institute corrective measures; (ii) A formal complaint is filed by the complainant or signed by the Title IX Coordinator (see Definitions); (iii) The alleged behavior/conduct must have occurred against a person while in the United States; (iv) At the time the formal complaint was filed, the complainant was participating or attempting to participate in the member's education program or activity. This includes an enrolled student, an employee, and applicants for admission or employment at the system member, and; (v) The alleged conduct meets the definition of sexual harassment as set forth in this regulation.[26]

38.     Sexual assault is defined as an offense that meets the definition of rape, fondling, incest or statutory rape as used in the FBl's Uniform Crime Reporting system. A sex offense is any sexual act directed against another person, without the consent of the victim, including instances in which the victim is incapable of giving <u>consent</u>. These offenses are defined as:[27]

> Rape: The penetration, no matter how slight, of the vagina or anus with anybody part or object, or oral penetration by a sex organ of another person, without the consent of the victim.

---

[26] *See* Exhibit 1, pp. 38-39.
[27] *See* Exhibit 1, p. 27.

Fondling: The touching of the private body parts of another person for the purpose of sexual gratification, without the consent of the victim, including instances where the victim is incapable of giving consent because of his/her age or because of his/her temporary or permanent mental incapacity.

Incest: Sexual intercourse between persons who are related to each other within the degrees wherein marriage is prohibited by law.

Statutory Rape: Sexual intercourse with a person who is under the statutory age of consent.

Sexual assault is explicitly prohibited under this regulation. Aiding another in the commission of sexual assault is also prohibited under this regulation. Sexual assault is a form of sexual harassment or sex-based misconduct.

39.   Consent is defined as clear, voluntary and ongoing agreement to engage in a specific sexual act. Persons need not verbalize their consent to engage in a sexual act for there to be permission. Permission to engage in a sexual act may be indicated through physical actions rather than words. A person who is asleep or mentally or physically incapacitated, either through the effect of drugs or alcohol or for any other reason, or whose agreement was made by threat, coercion, or force, cannot give consent. Consent may be revoked by any party at any time.[28]

40.   Incapacitated is defined as a state in which a person, due to a disability, the use of alcohol or drugs, being asleep, or for any other reason, is not capable of making rational decisions about consent to sexual activity and recognizing the consequences of their decision.[29]

41.   The hearing panel concluded that consent for the sexual acts was not obtained due to the level of intoxication of the complainant. The evidence used to support that finding is inconsistent, inconclusive and did not support that decision because it was not at all apparent to Doe that Roe was "incapable of providing consent." The panel also failed to make a finding that Roe was actually "incapacitated," as defined by the University rules,[30] nor was there any evidence that

---

[28] *See* Exhibit 1, p. 23.
[29] *See* Exhibit 1, p. 25.
[30] *See* Exhibit 1, pp. 21-50, more specifically p. 25.

Roe's alleged "incapability of providing consent" was readily apparent to Doe. Per the University's policy, intoxication does not negate consent only "incapacitation" does. The small amount of alcohol Roe drank in Doe's presence during the several hours (about four and one-half hours) they spent together – 50 milliliters (one "shot") of liquor (possibly vodka)[31] and three Smirnoff Ice[32,33], could not have rendered her incapacitated, impaired and/or unable to provide consent.

42.     The panel seems to equate intoxication – of any degree – with incapacitation which is contrary to the definition contained in the University's published Rules. It is thus not clear what definition of incapacitation the University purports to apply in disciplinary hearings.

43.     In order to find a student responsible for sexual assault for having sex with a student who is incapacitated, the incapacitation must be apparent – that Doe knew or reasonably should have known – that Roe was *incapacitated*. Not just tipsy, not even just intoxicated – intoxicated to the point that Roe was completely incapacitated.[34]

44.     In this case, Doe testified that he was not intoxicated, that the only difference in Roe he noticed is that she was more candid and honest in their conversation, that she never needed assistance walking or otherwise, that her speech was not slurred and that she didn't at all appear intoxicated. It was never *apparent* to Doe that Roe was even intoxicated, let alone intoxicated to the point of incapacitation.

---

[31] Vodka is 40% alc/vol; https://drinklively.com/what-proof-is-vodka/
[32]  Smirnoff  Ice  is  4.5%  alc/vol;   https://drizly.com/beer/specialty-beer-alternatives/malt-liquor/smirnoff-ice-original/p4696
https://alcoholvolume.com/smirnoff-ice-alcohol-content-percentage/
[33]  The University's report inaccurately states that Smirnoff Ice is 5% alc/vol, citing to Smirnoff's website which does not actually publish any alcohol content for any of its products. *See* Exhibit 1, p.5.
[34]  *See* Exhibit 1, p. 25; Exhibit 2.

### THE TITLE IX INVESTIGATION, HEARING AND APPEALS PROCESS

45.     The University unreasonably delayed investigating Doe's case and bringing it before the hearing officer.

46.     The alleged incident occurred on September 1, 2020. It was not until March 23, 2021 – almost seven months later – that Roe made a complaint to the University (likely because she was displeased about Doe's criminal case being dismissed). That fact alone should have been a red flag to the University.

47.     The interviews of Doe, Roe and the two witnesses took place between April 12, 2021 and May 17, 2021. The "Final Draft Report" was not rendered until nearly six weeks later, on July 1, 2021 – the report itself is only seven pages – and the hearing was not set for almost three more months, on September 16, 2021.

48.     While the investigator verbally interviewed Doe, which was recorded, the report written by the investigator did not comport with the actual interview.

49.     The investigator did not reach any determination concerning consent, as that was the responsibility of the assigned hearing panel.

50.     The investigator's draft report contained information previously unknown to Doe. For example, Roe's friend, X.S., states she had previously seen Roe drink five to six shots of Hpnotiq which resulted in Roe being "in a good mood," but she was able to handle that alcohol intake. The investigator failed to question Doe or Roe about this.

51.     Most importantly, the investigator completely failed to question Roe, as well as L.H. and X.S. – both of whom were possibly with Roe on the same date, but prior to her meeting-up with Doe – about whether or not Roe had consumed alcohol BEFORE she met-up with Doe on the evening of September 1st. And, because the investigator failed to inquire about this fact – undoubtedly what should have been the *most* important fact in the investigation – Doe's counsel

16

was not allowed to ask any questions related to alcohol consumption during the hearing – other than what was in the report.

52.     Based on the amount of alcohol Roe consumed on that night, the investigator estimated that at 11:00 p.m., her blood alcohol content (BAC) level to be either 0.127 or 0.17. Both estimates based on the false conclusion that Smirnoff Ice is 5% alc/vol – it is not it is 4.5% – and the higher estimate based on Roe adding moonshine to her Smirnoff Ice – even though there was absolutely no testimony to support moonshine being mixed with or added to her Smirnoff Ice. These BAC estimates are false, not empirically based, unsubstantiated and highly misleading. Nonetheless, the panel was allowed to consider this "fake" evidence in rendering its decision.

53.     Because the investigator was not a medical doctor or expert, Doe requested that he be allowed time to confer with such expert to obtain a better understanding of what Roe and Doe's BAC could truly have been, but that request was denied.

54.     The assigned investigator ultimately submitted her final draft of the investigation report to the Hearing Officer/panel without any responses by Doe or Roe to the draft investigation report, and the investigator did not perform any further investigation concerning additional expert witness, nor did she consult with a medical expert.

55.     Approximately three weeks after the final hearing, Doe received email correspondence advising that the panel found he was responsible for Sexual Assault and that his sanction is expulsion.

56.     Although true cross-examination and attorney advocacy were not permitted during the Title IX hearing, Doe was permitted to ask limited questions during the hearing.

57.     Doe's counsel was not allowed to ask Roe any questions about alcohol – how often she uses alcohol, how many times she had previously consumed alcohol, her habits regarding

consumption of alcohol, and whether she consumed alcohol *before* meeting-up with Plaintiff on the night in question.

58.     The panel outlined their determinations, finding Doe responsible for sexual assault in the Case Decision letter of October 6, 2021.

59.     The hearing panel concluded that consent for the sexual acts was not obtained because the level of intoxication of Roe made her incapable of providing consent, and that Doe knew or reasonably should have known about Roe's inability to provide consent.

60.     The hearing panel did not use the word "incapacitated" or make any such finding that Roe was incapacitated – which is required by the University rules.

61.     The decision went on to say that Roe *indicated* that she stated verbally that she did not want to have sex with the respondent. This wording is quite curious because this is not actually a *finding* that she told Doe that she did not want to have sex with him. Instead, it's just a regurgitation of *her* testimony only, but not Doe's, regarding that matter. Doe testified that their sex was completely consensual and that Roe at no time indicated that she didn't want to have sex – oral or otherwise – with Doe.

62.     When faced with different testimony regarding the same event, the panel found only Roe credible and accepted only her version of the events over Doe's. The panel took Roe's testimony as true and placed the burden of *disproving* the allegations with Doe, in violation of its own policies.[35]  The panel found Doe responsible only by ignoring and disregarding its clear definition of "incapacitation" and the obvious problems with Roe's credibility. The Hearing Officer improperly shifted the burden of proof in the case.

---

[35] *See* Exhibit 1, pp. 37-38; University Rule 4.2.10 (b).

63.     Upon receiving the panel's October 6th decision, on October 11, 2021, Doe filed his

appeal,[36]  which was denied on October 28, 2021.[37]

64.     While the University knew Doe was represented by counsel, it refuses to communicate

with said counsel and only forwarded its October 6th and October 28th decisions to Doe, himself.

The University has refused to provide Doe or his counsel with the hearing transcript.

65.     As of the date of the filing of this complaint, Doe still has full access to all of his classes.

**COUNT I: TITLE IX**
**Erroneous Outcome**
**20 U.S.C. § 1681, *et seq*.**

66.     Doe repeats and re-alleges the allegations of the preceding paragraphs as if fully restated

herein.

67.     Title IX applies to an entire school or institution of higher education if any part of that

school receives federal funding. The Texas A&M University system – including Texas A&M

University-Kingsville – receives federal funding and is covered by Title IX.

68.     Title IX, 20 U.S.C. §§ 1681, *et seq*., provides, in relevant part, "[n]o person in the United

States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be

subjected to discrimination under any education program or activity receiving Federal Financial

assistance."

69.     A university violates Title IX when it reaches an erroneous outcome in a disciplinary

proceeding when the reason for that erroneous outcome is gender bias.

70.     When concern about the reliability of the outcome becomes grave, gender bias may be

inferred. Here, the University erroneously found Doe responsible for sexual assault when there

was no evidence in the record about whether or how he knew or reasonably should have known

---

[36] *See* Exhibit 4.
[37] *See* Exhibit 3.

that Roe was *incapacitated*, as defined by the University's policies and without making any finding that Roe was in fact incapacitated – not just tipsy or intoxicated. Additionally, the panel only considered Roe's testimony regarding the incident in question while wholly disregarding Doe's testimony. There are grave doubts about the reliability of this outcome, and gender bias may be inferred.

71.     This erroneous outcome was based upon procedural errors that limited the facts before the panel and a misapplication of the University's standards and definitions to those facts.

72.     This outcome was also based upon the University's failure to conduct an adequate, equitable, and reliable investigation, as their policies require.

73.     The investigation was conducted in a manner biased against Doe and in favor of confirming Roe's version of events.

74.     As a result of the foregoing, the University reached an erroneous outcome in the disciplinary action against Doe, and the facts and circumstances leading to that erroneous outcome were motivated by gender bias.

**COUNT II: TITLE IX**
**Selective Enforcement**
**20 U.S.C. § 1681, *et seq*.**

75.     Doe repeats and re-alleges the allegations of the preceding paragraphs as if fully restated herein.

76.     A University is liable for gender discrimination under Title IX if its decision to initiate disciplinary proceedings is affected by the student's gender.

77.     Title IX includes an implied private right of action, without any requirement that administrative remedies, if any, be exhausted. An aggrieved plaintiff may seek money damages and other relief.

78.     The evidence obtained during the investigation in this case and at the hearing indicated that Doe and the female student had sex. While Roe claims she was intoxicated, Doe was not. The panel chose to consider only the non-credible testimony of the female student who claimed to be intoxicated while completely disregarding the testimony of the male student who was not intoxicated.

79.     The panel's determination that Doe was responsible for sexual assault was based on a gender-biased belief that when the two students had sex, that the male student is somehow responsible for sexual assault because the female student was intoxicated to the point she was "incapable of providing consent." If Roe was intoxicated to the point she was "incapable of providing consent," that was not at all apparent to Doe, and the only way that would have been possible is if the female student was drinking alcohol BEFORE she met-up with Doe. The panel completely disregarded Doe's testimony and chose only to believe Roe. The panel also failed to make a determination as to whether Roe was incapacitated.

80.     If any level intoxication actually invalidates consent, then in this case the school is enforcing its rules only against the male student.

81.     To the extent incapacitation means something more than mere intoxication at the University, the fact that neither student's BAC was tested and that the panel only considered the female student's testimony and took only her rendition of the events as true indicates improper gender bias in the University's application of its sexual misconduct policies.

82.     This is intentional gender discrimination under Title IX, and it has resulted in disciplinary proceedings against Doe and a concomitant failure to conduct an investigation against his female accuser, who admittedly engaged in sexual activity with Doe when she was intoxicated.

83.     The University thus committed impermissible gender bias against Doe in the investigation and adjudication of the September 1, 2020 incident.

84.     As a direct and proximate result of the Defendant's violations of Doe's rights under Title IX, Doe has suffered severe and substantial damages. These damages include diminished earning capacity, lost career and business opportunities, litigation expenses including attorney fees, loss of reputation, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and other compensatory damages, in an amount to be determined by a jury and the Court.

85.     Pursuant to 42 U.S.C. § 1988, Doe is entitled to his attorneys' fees incurred in bringing this action.

## COUNT III: DEPRIVATION OF DUE PROCESS
### 42 U.S.C. § 1983, Denial of Fourteenth Amendment Due Process

86.     Doe repeats and re-alleges the allegations of the preceding paragraphs as if fully restated herein.

87.     This action is also brought against Defendant pursuant to 42 U.S.C. § 1983.

88.     Defendant, acting under color of law, deprived plaintiff of his education at the University without due process of law, in violation of the 4th and 14th Amendments of the United States Constitution.

89.     Plaintiff has a constitutionally protected property interest in enrollment as a student at the University.

90.     Plaintiff has a legitimate expectation of continuing education through graduation. Defendant expelled Plaintiff without giving him a fair investigation as required by its own policies.

91.     Defendant did not provide Plaintiff with: (1) notice of the charges against him; (2) an impartial tribunal to determine the validity of the charges against him; or (3) a meaningful hearing at a meaningful time.

92.     Plaintiff seeks a declaration by this Court, in accordance with 28 U.S.C.§ 2201 and the Texas Uniform Declaratory Judgment Act, Texas Civil Practice & Remedies Code, Sections 37.001, *et seq*., that Dr. Mark Hussey violated his constitutional rights.

93.     42 U.S.C. § 1983 provides, in pertinent part, that any person who deprives any citizen of the United States of any rights, privileges, or immunities secured by law shall be liable to the party injured in an action at law or in equity.

94.     The Fourteenth Amendment to the Constitution provides that no state shall "deprive any person of life, liberty or property, without due process of law."

95.     Dr. Hussey is a state actor subject to the Fourteenth Amendment. As the University's president, Dr. Hussey is responsible for designating the Title IX Coordinator directly responsible for executing all Title IX functions—including policymaking and adjudication.

96.     A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

97.     A student's interest in pursuing an education is included in the Fourteenth Amendment's protection of liberty and property. A student facing expulsion from a public educational institution is entitled to the protections of due process.

98.     Due process requires, at minimum, notice and opportunity for a meaningful hearing.

99.     "Meaningful hearing" is disputed across federal circuits, and courts are clear that an accused student may not be entitled to the full protections he might receive in a criminal trial.

100.    Cross-examination is held up as one of the most meaningful tools sufficient to make "issues of credibility and truthfulness…clear to the decision-makers."[38]

---

[38] *Doe v. University of Cincinnati*, 872 F.3d 393, 402 (6th Cir. 2017) (internal citations omitted).

101.    In Doe's case, he was not afforded an opportunity to fully cross-examine, both because of the University's hearing procedures and because of the biased investigation.

## COUNT IV: BREACH OF CONTRACT

102.    Doe repeats and re-alleges the allegations of the preceding paragraphs as if fully restated herein.

103.    Doe applied to and enrolled in the University, paying the associated tuition and fees and, in return, the University contracted to provide Doe access to its undergraduate degree program. Doe did so with the understanding and reasonable expectation that Defendant would apply and enforce the policies and procedures set forth in their official publications.

104.    Defendant breached its contract with Doe when it failed to provide him with a fair investigation or hearing, which resulted in his expulsion.

105.    At all times material to this petition, Doe was ready, willing, and able to perform his part of the agreement between the parties, and did in fact perform each and every part of the agreed upon contract, up to the point of termination.

106.    In violation of all promises and obligations under the agreement described herein, Defendant failed to conform to the terms of the contract. Plaintiff fully performed all duties agreed upon under his contract.

107.    The relationship is therefore contractual in nature, and Defendant's official publications and written policies serve as evidence of the contract between these parties.

108.    The University is bound to follow its written policies and procedures, including those contained in the University's rules.

109.    Defendant breached its contract with Doe by failing to comply with their obligations and follow their written policies and procedures during the investigation and adjudication process.

110.    A non-exhaustive list of Defendants' breaches: applying the incorrect evidentiary standards as to consent and incapacitation; applying an evidentiary presumption in favor of the female Complainant; failing to conduct a fair and impartial investigation equitable to all parties; failing to allow Doe and his counsel adequate opportunity for cross examination of adverse witnesses; failure to properly or fully review and decide upon Doe's appeal.

111.    Defendant's breach of its obligations proximately caused Doe damages, including loss of educational and career opportunities, and other direct and consequential damages that were foreseeable consequences of Defendant's actions.

112.    Doe is entitled to recover damages for Defendant's breach of their obligations in an amount to be determined at trial.

113.    As addressed in the preceding paragraphs of this Complaint, Doe could not possibly have received a meaningful hearing in a proceeding in which the hearing officer applied incorrect definitions of key terms, denied his advisor permission to ask essential questions, applied incorrect burdens of proof, and denied him the presumption of innocence enshrined in the University's own procedures and rules.

114.    Defendant failed to comply with the agreement with Plaintiff as required under the contract, and this breach has proximately caused Plaintiff to suffer actual, incidental, and consequential damages.

**COUNT V: NEGLIGENCE**

115.    Doe repeats and re-alleges the allegations of the preceding paragraphs as if fully restated herein.

116.    A Defendant is negligent when that person or entity has a legal duty, breaches that duty, and damages are proximately caused by the breach of duty. The components of proximate cause are cause-in-fact and foreseeability.

117.    In conducting its investigation and adjudication of Roe's complaint against Doe, the University owed a common law duty to Doe to exercise reasonable care, with due regard for the truth, an evenhanded application of procedure, and the important and irreversible consequences of its actions, as well as John Doe's various liberty and property rights and interests generally.

118.    Through the acts set forth above, the University, acting through its agents, servants and/or employees, breached that duty by carelessly, improperly, and negligently performing its assigned duties and facilitating a process that violated the rights and interests of Doe.

119.    In particular, the University has negligently trained and supervised the individuals it employs to investigate claims of sexual misconduct, adjudicate those claims, or otherwise implement the Policy. Furthermore, the University negligently trained the members of Doe's hearing panel in the Policy's definition of "incapacitation" and in applying the preponderance of the evidence standard.

120.    As a direct result of the University's negligence, and as a direct and proximate cause thereof, Doe has been seriously and irreparably damaged in the following ways, among others: he has endured extreme emotional and psychological suffering as a result of the University's one-sided treatment of the false sexual assault charges against him; he lost the ability to obtain college credit during the Fall 2021 semester; his attainment of a college degree, if any, will be delayed, thereby delaying the time at which he can begin a career and the shortening of the length of that career; his academic records from the University will reflect his expulsion, handicapping his ability to be accepted at a transfer school or graduate school or to secure his desired employment; and he

26

will suffer a permanent reduction in lifetime earnings. Accordingly, the University is liable to Doe for negligence and for all damages arising out of that violation.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff respectfully prays that this Honorable Court allow Plaintiff to recover from Defendant the following:

a.  Plaintiff seeks all damages allowed under the law, including monetary relief;

b.  Plaintiff seeks an injunction that prohibits Defendant from instituting expulsion against Doe;

c.  Plaintiff seeks compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, stress, and other nonpecuniary losses;

d.  Plaintiff seeks reasonable attorney's fees and costs, including reasonable expert fees;

e.  Plaintiff seeks pre- and post-judgment interest at the maximum rate allowed by law;

f.  all direct damages;

g.  consequential and incidental damages, which may include the value of lost income for advancements, lost salary income for future employment, and whatever else may be proven during the course of litigation;

h.  compensatory and non-compensatory damages, whether general or special, in an amount deemed sufficient by a trier of fact;

i.  liquidated and/or exemplary damages;

j.  court costs, including the costs of litigation; and

k.  any other relief that the Court deems appropriate.

Respectfully submitted,

GALE LAW GROUP, PLLC
711 N. Carancahua St., Suite 1660
Corpus Christi, Texas 78401
Mailing Address:

P.O. Box 2591
Corpus Christi, Texas 78403
Phone Number: 361-808-4444
Fax Number: 361-232-4139

By: */s/ Amie Augenstein*
Amie Augenstein
*Attorney-in-Charge for Plaintiff*
Texas Bar No. 24085184
Southern District Bar No. 2236723
Amie@GaleLawGroup.com

*/s/ Christopher J. Gale*
Christopher J. Gale
*Attorney for Plaintiff*
Texas Bar No. 00793766
Southern District Bar No. 27257
Chris@GaleLawGroup.com

## **Demand for Jury Trial**

Plaintiff hereby demands trial by jury pursuant to Fed. R. Civ. P. 38(b).

## **CERTIFICATE OF SERVICE**

I hereby certify that although counsel of record for Defendant has not yet been identified, on this, the 2nd day of November, 2021, a true and correct copy of the forgoing was served on Ray Bonilla, general counsel for the Texas A&M University System by the means indicated below:

**Ray Bonilla**                                        ***Via E-Mail: rbonilla@tamus.edu***
Texas A&M University System
Office of General Counsel
Moore/Connally Building, 6th Floor
301 Tarrow Street
College Station, Texas 77840

*/s/ Christopher J. Gale*
Christopher J. Gale

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **JOHN DOE** | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO.** _____ |
| **TEXAS A&M UNIVERSITY-** | § | **JURY** |
| **KINGSVILLE & MARK HUSSEY** | § | |
| *in his official capacity as President* | § | |
| *of* **TEXAS A&M UNIVERSITY-** | § | |
| **KINGSVILLE** | § | |

### PLAINTIFF'S AFFIDAVIT IN SUPPORT OF PLAINTIFF'S ORIGINAL VERIFIED COMPLAINT AND MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINATY INJUNCTION TO PRESERVE THE STATUS QUO

BEFORE ME, the undersigned authority, personally appeared Derrion Warner identified as John Doe in the above-referenced cause, who swore on oath that the following facts are true and correct:

"My name is Derrion Warner. I am over the age if 18 years and I am of sound mind. I am personally acquainted with the facts alleged in *Plaintiff's Original Complaint* as well as the *Motion for Temporary Restraining Order and Preliminary Injunction to Preserve the Status Quo*. The facts set forth in the proceeding Complaint and Motion are true, correct and are within my personal knowledge. Although my name is not actually John Doe, I intend to proceed under a pseudonym out of concern for my privacy as well as my personal and professional reputation. To preserve my anonymity, I sign this verification under both my legal name as well as my intended pseudonym.

Further Affiant sayeth not."

_____
John Doe, Affiant

_____
Derrion Warner *a/k/a* John Doe, Affiant

**STATE OF TEXAS**          §
                                         §
**COUNTY OF KLEBERG**    §

SUBSCRIBED AND SWORN TO BEFORE ME on this the 2nd day of November , 2021, to certify which witness my hand and official seal.

ERVIN DICKERSON JR
NOTARY PUBLIC STATE OF TEXAS
MY COMM. EXP. 02/02/2024
NOTARY ID 12805656-5

_____
Notary Public in and for
The State of Texas

1