IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| JOHN DOE,<br>    *Plaintiff,*<br><br>v.<br><br>TEXAS A&M UNIVERSITY –<br>KINGSVILLE, MARK HUSSEY, IN HIS<br>OFFICIAL CAPACITY AS PRESIDENT OF<br>TEXAS A&M UNIVERSITY - KINGSVILLE<br>    *Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO.  2:21-cv-00257 |

## DEFENDANTS' MOTION TO DISMISS AND RESPONSE TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Defendants Texas A&M University Kingsville ("TAMUK") and Mark Hussey, in his official capacity as President of Texas A&M University Kingsville ("Official Capacity Defendant") (collectively "Defendants"), file this combined response to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction to Preserve the Status Quo [dkt. 3] ("PI Motion") and motion to dismiss Plaintiff's Original Complaint [dkt. 1-2] ("Complaint").

## I.     INTRODUCTION

This is a case of "she said" she did not consent to sex and moreover was too incapacitated by alcohol to do so, versus "he said" she consented and was not incapacitated—by the alcohol Plaintiff John Doe's Complaint ("Doe," "Plaintiff") admits that he fed Jane Roe ("Roe") until, the Complaint also admits, Roe was vomiting in Plaintiff's bathroom.  And present in the Title IX investigation record is two outcry

witnesses' testimony describing a degree of alcohol intoxication observed immediately after Roe left Doe's apartment sufficient to render Roe incapable of consenting to sex with Doe: multiple episodes of vomiting *including in the parking lot outside Doe's apartment and in the car driving back* from Doe's apartment. One of those witnesses testified that Roe was slurring her speech; both testified that Roe was having trouble walking; and one that Roe was struggling to stand. *See* dkt 10 Plaintiff's Ex. 1 at 5.[1]

That testimony comports with the Blood Alcohol Calculator (BAC) analysis also in the investigation record, which found that Roe's BAC would have been between .099 and .17. *See id.* at 7. A .099 BAC means Roe would have had impaired balance, speech, judgement, reasoning, and reaction time; a .17 BAC means Roe would have experienced severely impaired balance, speech, judgement, reasoning, reaction times, blurred vision, anxiety, nausea, and could black out or pass out. *Id.*

Further of the night in question, one of the outcry witnesses testified she received two Snapchat[2] messages from Roe: one with Roe's location at Doe's apartment asking to be picked up—and the other showing Roe crying naked on a bathroom floor, stating that "*he had choked her.*" *See id.* And both witnesses stated that Roe outcried to them upon

---

[1] Plaintiff filed under seal four exhibits, which he references in his Complaint. *See* dkts. 10, 11, 12, 13. The citations in the instant motion refer to the pdf page numbers of those exhibits. Those exhibits are properly considered part of Doe's pleadings. "Pleadings" for purposes of a Rule 12(b)(6) motion include attachments to the complaint. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). Thus, the exhibits to his Complaint that Doe filed under seal—dkts 10-13, Plaintiff's Exhibits 1-4—are properly referenced in the Rule 12(b)(6) portion of this motion.

[2] A short video message primarily used through the "Snapchat" app. Dkt 10 Plaintiff's Ex. 1 at 5 n.2. Snapchat is set to automatically delete messages after the recipient sees them, though a user can change this setting. *See* https://www.alphr.com/does-snapchat-automatically-delete-conversations/ (last accessed November 30, 2021).

pickup that Doe had raped her: forcing her to perform oral sex and "forcing himself inside her," according to one; forcing his penis into Roe's mouth, "rap[ing]" her, and holding her hands down while he had anal sex with her, according to the other. *Id*. All of that comports with Roe's record testimony.

Accordingly, pursuant to a complaint of sexual assault Roe filed against Doe by Roe, TAMUK conducted an investigation and found Doe responsible for the sexual assault of Roe based on Doe's failure to obtain Roe's consent—both because Roe's level of alcohol intoxication made her incapable of providing consent and Doe knew or should have reasonably known about that incapacity, and also, and independently, that Roe indicated she stated verbally to Doe that she did not want to have sex. *See* dkt 11 Plaintiff's Ex. 2 at 2.

In doing so, TAMUK officials impartially investigated Roe's allegation and held a live Zoom hearing in excess of five hours in which the parties, witnesses, and the investigator testified before the hearing officer and were subject to cross-examination; the hearing officer found Plaintiff responsible for the sexual assault and sanctioned him accordingly; Doe was notified of that finding and his sanction of expulsion on October 6, 2021; and Plaintiff unsuccessfully appealed this decision on October 11, 2021, with TAMUK notifying him it was upholding the appealed finding of sexual assault together with the expulsion sanction on October 28, 2021.

Doe now asks this Court to preliminarily enjoin, *see* dkt 3, the sanction TAMUK decided upon in that proceeding—expulsion, *see* dkt 11 Plaintiff's Ex. 2 at 2—to

permanently enjoin TAMUK's *already taken* decision to expel Doe, *see* dkt. 1-2 at p27, and to grant Doe monetary damages, *see id*. Doe requests this relief based on the theory that TAMUK's investigation and proceeding breached his due process rights, *id*. at ¶¶ 86-101; gives rise to Title IX erroneous outcome, *id*. at ¶¶ 66-74, and selective enforcement claims, *id*. at ¶¶ 75-85; and sounds in breach of contract, *id*. at ¶¶ 102-114, and in negligence, *id*. at ¶¶ 115-120.

Doe brings these claims and requests this relief based on conclusory claims that the Title IX investigation was biased against Doe based on his gender because it treated his and Roe's testimony differently, *see, e.g.*, dkt. 1-2 at ¶¶ 2, 6, 7(a), 19-20, 22; irrelevant— and erroneous, since objections are not permitted under the relevant federal regulations—allegations that Doe's attorney was unable to make the sorts of objections and ask the sorts of questions he would have been able to in a criminal trial, *see, e.g.*, *id*. at ¶¶ 5, 19; various inaccurate claims that the investigation did not let in relevant information, *see, e.g.*, *id*. at ¶¶ 19-21; and the wholly implausible claim—given that Doe *admits* he fed Roe alcohol to the point that she was vomiting in his bathroom—Title IX investigation erred in finding that Roe was incapacitated by alcohol and that Doe should have known this, *see, e.g.*, *id*. at ¶¶ 2, 7(b)-(c).

The Court should refuse Doe's request for preliminary injunctive relief, and it should grant Defendants' motion to dismiss Doe's Complaint in its entirety.  Sovereign immunity bars Doe's § 1983 due process claims, negligence claim, and breach of contract claim against Defendants, and the *Ex Parte Young* exception does not apply to any of those

claims;[3] this requires dismissal of all those claims pursuant to Rule 12(b)(1). And Doe fails to plead facts sufficient to state a claim for either of his Title IX claims—selective enforcement and erroneous outcome—or his § 1983 due process claims, requiring dismissal of all those claims under Rule 12(b)(6). For those reasons, none of Doe's claims possesses any likelihood of success on the merits; for that reason, and for the others explained below, Doe's request for a preliminary injunction should also be denied.

Doe is not entitled to any injunctive relief pending the resolution of this case. Plaintiffs' artful pleading aside—he asks the Court to enjoin TAMUK from *effectuating* its decision to expel him and from *instituting* expulsion against him, *see* dkt 1-2 at 8-9 n.15, 27—his request is for the Court to effect a change to the status quo: Doe, as he admits no less than seven times in his Complaint, has already been expelled. That was the status of the parties as of October 28, 2021, before Plaintiff filed his motion for a temporary restraining order and preliminary injunction, together with his complaint, on November 2, 2021.

Plaintiff is not entitled to any injunctive relief pending the resolution of this case. Plaintiff's motion asks the Court to intervene to change the status quo by ignoring TAMUK's Title IX procedures, conclusions, and sanctions based on a Complaint rife

---

[3] Although the *Ex parte Young* doctrine allows state officials to be enjoined for claims for prospective relief, the doctrine does not apply here because, as a practical matter, Plaintiff's requested relief—his artful pleading as to "seek[ing] to enjoin [TAMUK] from *effectuating* its decision to expel Plaintiff," dkt 1-2 at 8-9 n.15 (emphasis added), aside, the expulsion decision was taken and Doe's appeal of it denied *before* Doe filed his suit. Thus Doe's request for an injunction enjoining his expulsion is, as a practical matter, a request to undo the decision to expel him and as such a request for retroactive relief—not for an order enjoining an ongoing violation of federal law.

with speculative and conclusory allegations and outright misstatements of the facts. Plaintiff cannot show irreparable harm. A final judgment on the merits of Plaintiff's Complaint would rectify any harm that Plaintiff suffers. Numerous courts have held that a delay in education—Doe, a transfer student from a college in California, has already indicated his willingness to pursue his education at different institutions—is not irreparable. In addition, reputational harm is compensable in damages. Moreover, Plaintiff is unlikely to succeed on the merits: in fact, as argued below, Doe's Complaint should not survive a combined Rule 12(b)(1)-Rule 12(b)(6) motion to dismiss.

This is because the crux of Plaintiff's argument during TAMUK's proceedings and in this case is that TAMUK's three-person hearing panel should have believed Doe's own version of events, presented in an investigation report repeatedly evincing Doe's—who contends he was not intoxicated on the night in question—inability to remember critical details about the evening,[4] a version which is moreover uncorroborated by any witnesses, instead of Jane Roe's, which directly contradicted Doe's version, and which was corroborated not only by two outcry witnesses, together with documentary evidence—including text messages and BAC analysis—but even, in crucial part, by Doe's very own admissions in his Complaint: Doe's Complaint admits Roe went to the bathroom immediately after they had sex to vomit, and he does not deny it was due to excessive alcohol consumption nor allege that it had another cause, such as food-borne

---

[4] *See* dkt 10 Plaintiff's Ex. 1 at 6, 7, 63.

illness. *See* dkt 1-2 ¶ 17. And TAMUK did not believe Doe, Doe contends, because of the gender of the complainant and Plaintiff—so goes Doe's argument.

Plaintiff sues under Title IX and the 14th Amendment of the United States Constitution. Plaintiff asserts two theories of liability under Title IX. First, he seeks to articulate an erroneous-outcome claim. To state an erroneous-outcome claim, a plaintiff must plausibly allege that (1) he is innocent and was wrongly found to have committed the offense and (2) gender bias was a motivating factor behind the erroneous finding. Here, Plaintiff can do neither. His central argument, explained above, is that TAMUK should have believed his uncorroborated version of events, not Jane Roe's corroborated one— and, presumably, disregarded Doe's Complaint's own admission that Roe was so drunk she was vomiting.  This is no more than an attack on the credibility findings of two investigators and the hearing panel who substantiated the lack of consensual sex by a preponderance of the evidence—the evidentiary standard required by TAMUK's governing regulations. *See* dkt 10 Plaintiff's Ex. 1 at 26 (Texas A&M University System Regulation "08.01.01 Civil Rights Compliance Preponderance of the evidence . . . The preponderance of the evidence is the standard of evidence used for all determinations made under this regulation."). The panel was entitled to believe a version of events that had Jane Roe intoxicated to the point she was without capacity to consent. Further, Plaintiff's allegations regarding the second element—that TAMUK erred because of gender bias—are conclusory and insufficient to state a claim.

Second, Plaintiff seeks to articulate a selective-enforcement Title IX claim. This effort fails as well. Where courts have adopted that cause of action, they require a plaintiff to plausibly allege that regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was based on sex. In other words, Plaintiff must plead that a female—not the complainant—was in circumstances sufficiently similar to Plaintiff and that this comparator was treated more favorably.

Again, the allegations in the Complaint are insufficient to proceed on this theory. Plaintiff has identified no comparator who was similarly situated. In addition, Plaintiff cannot plausibly allege that the TAMUK initiated the investigation because the female student, Jane Roe, did so. And the severity of the sanctions Plaintiff received correspond precisely to those provided for under TAMUK's rules and policies.

Plaintiff also seeks to assert a due-process claim.  This claim is procedurally barred and substantively inadequate. Procedurally, Doe's constitutional law claim is barred by the Eleventh Amendment and does not fall within the *Ex Parte Young* exception because he does not seek prospective injunctive relief. Substantively, he fails to adequately allege a due process claim because it is undisputed Plaintiff's claim was investigated and the investigators were subjected to cross-examination at the live hearing, Plaintiff's counsel in this litigation was also present at the live hearing and   cross-examine witnesses extensively, including Plaintiff's accuser; and finally, the preponderance of the evidence standard is commonly used in civil proceedings and allowed under the Department of Education's Final Rule on Title IX investigations and hearings.

Finally, Doe asserts breach of contract and negligence claims. Both of those are procedurally barred by sovereign immunity.

## II.    FACTS

Doe's Complaint states that Doe and Roe met online via Twitter, a social media messaging app, in May 2020. Dkt. 1-2 at ¶ 15. Twitter is not a dating application, but a microblogging service on which members broadcast short posts called "tweets"; according to Roe, Doe simply found her on the messaging app and messaged her. *See* dkt 10 Plaintiff's Ex. 1 at 26. According to the Complaint, on September 1, 2020, Roe accepted the invitation of Doe to "hang-out at his place … [and] drink alcohol," *id*. at ¶ 16. Doe was a third-year junior, a defensive back on TAMUK's football team, and over 21; Roe was in the first month of her first year of college, and—as noted—under 21.

According to his Complaint, Doe, from the time he picked Roe up in his car, was feeding Roe alcohol, which she drank: a shot of alcohol when he picked her up, and three Smirnoff Ices upon return to Doe's apartment. Dkt. 1-2 at ¶ 16. Doe's Complaint states that he added a bottle cap of moonshine to each of his Smirnoffs, and the Complaint does not deny that he added the same—or more—to Roe's. *See id*. ¶¶ 16, 52. Roe, at the time, weighed 103 pounds. *See* dkt 10 Plaintiff's Ex. 1 at 88.

According to the Complaint, Doe and Roe began to have sex on Doe's apartment's couch; they then went to the bedroom and continued to have sex; and "afterward[] Roe went to the restroom where she apparently vomited and called her friends to pick her up." Dkt. 1-2 at ¶ 17. Roe's record testimony is different.

After the second Smirnoff, Roe began to feel queasy and as if her heart rate had slowed. *See* dkt 10 Plaintiff's Ex. 1 at 4. After the third Smirnoff, she began to slur and stumble when she walked. *Id*. Roe told Doe she felt unwell, and Doe directed Roe to the bathroom. *Id*. Roe went to the bathroom and vomited; when she returned to the living room she again informed Doe she was not feeling well. *Id*. Doe told her to "push through it." *Id*.

Doe and Roe were sitting on the living room couch when Doe, according to Roe, began to undress her; Roe told him that this was not what she wanted for them and that she did not want to have sex. *Id*. Roe was slurring her speech and could not see Doe clearly. *Id*. By this time Doe was on top of Roe, and he inserted his penis into her vagina; Roe felt sick and was unable to defend herself. *Id*. Doe then held Roe's head in his hands and forced his penis into her mouth, causing Roe to gag and vomit on Doe's penis. *Id*. at 4-5. Doe then carried Roe—who was struggling to walk—to his bedroom, placed her over the side of the bed, and penetrated her anally. *Id*. at 5. Roe cried and told Doe to stop, but Doe continued and told her to "take it like a champ." *Id*. After forcing Roe to have anal sex, Doe forced his penis into her mouth. *Id*. Once Doe "had finished," Roe went to the restroom where she vomited and contacted her friends. *See* dkt 10 Plaintiff's Ex. 1 at 4-5.

According to the Complaint, Roe filed a complaint with TAMUK on March 23, 2021, and on September 16, 2021 TAMUK held a five-hour hearing with a three-member panel. Dkt 1-2 at ¶ 19. Also according to the Complaint, on October 6, 2021 TAMUK expelled Doe "based on the decision of the hearing panel finding him responsible for

committing "Sexual Assault." *Id*. ¶ 24. TAMUK, according to the Complaint, arrived at that finding because Roe's level of intoxication rendered her incapable of providing consent and that Doe knew or reasonably should have known of Roe's incapacity to provide consent, *id*. ¶¶ 25, 4—and that Roe, further, testified that she stated verbally to Doe that she did not want to have sex with him, *id*. ¶ 25.

## I. MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION

### A. Standard of Review

Federal Rule of Civil Procedure 12(b)(1) governs motions to dismiss for lack of subject-matter jurisdiction. FED. R. CIV. P. 12(b)(1). When the court lacks the statutory or constitutional power to adjudicate a case, the case is properly dismissed for lack of subject-matter jurisdiction. *Hooks v. Landmark Indus., Inc.*, 797 F.3d 309, 312 (5th Cir. 2015). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* Under a Rule 12(b)(1) jurisdictional challenge, the Court may consider any of the following: "(1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Robinson v. TCI/US West Commc'ns Inc.*, 117 F.3d 900, 904 (5th Cir. 1997).

### B. Arguments & Authorities

**1. Sovereign immunity bars Doe's §1983 14th Amendment[5] due process claim against Defendants—and the Ex Parte Young exception does not apply**

Plaintiff's due process claim is barred because the Eleventh Amendment to the United States Constitution bars an individual from suing a state in federal court unless the state consents to suit or Congress has clearly and validly abrogated the state's sovereign immunity. *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999). Eleventh Amendment immunity applies to Plaintiff's due process claims ostensibly brought pursuant to Section 1983.[6] *See, e.g., Quern v. Jordan*, 440 U.S. 332, 341 (1979). Texas has not waived its federal court immunity from suit under civil rights statutes. *Aguilar v. Tex. Dep't of Crim. Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998).

Further, state entities have immunity from claims brought under Section 1983 because Congress has not specifically abrogated their immunity under that statute. *See, e.g., Quern*, 440 U.S. at 340-55. Finally, the Fifth Circuit and other courts in this district have consistently held that public Texas universities—such as TAMUK—are arms of the State of Texas and therefore afforded the same immunities as the state. *See Elhaj-Chehade v. Office of Chief Admin. Hearing Officer*, 235 F.3d 1339, 1 (5th Cir. 2000).

---

[5] The Complaint's section heading in this connection reads "COUNT III: DEPRIVATION OF DUE PROCESS 42 U.S.C. § 1983, Denial of Fourteenth Amendment Due Process." *See* dkt 1-2 at 22. While Doe includes one reference to the 4th Amendment in that section—"in violation of the 4th and 14th Amendments," *see id.* at ¶ 88—this does not describe a cause of action relevant to Doe's allegations, nor does Doe explain how it does. The Court should disregard Doe's mention of the 4th Amendment or, in the alternative, dismiss any 4th Amendment claim it may read into Doe's Complaint.

[6] *See* dkt 1-2 ¶¶ 87, 93.

The fact that Plaintiff has styled this claim as a declaratory judgment claim[7] is not relevant. The Declaratory Judgment Act provides no independent cause of action. The operation of the Declaratory Judgment Act is "only 'procedural' . . . leaving 'substantive rights unchanged.'" *Medtronic, Inc. v. Mirowski Family Ventures*, LLC, 571 U.S. 191, 199 (2014) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937) and then *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 509 (1959)). Therefore, the Act "is not an independent source of federal jurisdiction; the availability of such relief presupposes the existence of a judicially remediable right." *Schilling v. Rogers*, 363 U.S. 666, 677 (1960) (internal citation omitted). Because the Declaratory Judgment Act provides no independent cause of action, Plaintiff may not use the Act alone as a vehicle to bring its Due Process claim into federal court.

Because TAMUK has not waived its immunity from suit under Section 1983, and because Congress has not specifically abrogated such immunity, this Court lacks jurisdiction to hear Plaintiff's constitutional claim. *See Olivier v. Univ. of Tex. Sys.*, 988 F.2d 1209, 1993 WL 81990, *1 (5th Cir. 1993) (per curiam) (affirming dismissal under Rule 12(b)(1) of plaintiff's Section 1983 claim against state university). In consequence, the Court must dismiss that claim under Rule 12(b)(1).

That said, the Supreme Court set out a narrow exception to sovereign immunity in *Ex parte Young*, 209 U.S. 123 (1908). That exception does not apply here.

---

[7] *See* dkt 1-2 ¶ 92.

To fall under the *Ex parte Young* exception, the plaintiff must allege facts demonstrating a violation of a federal law, the suit "must be brought against individual persons in their official capacities as agents of the state," and "the relief sought must be declaratory or injunctive in nature and prospective in effect." *Aguilar v. Tex. Dep't of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998). "In determining whether the *Ex parte Young* doctrine avoids [sovereign immunity's] bar to suit, a court need only conduct a 'straightforward inquiry' into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Public Serv. Com'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296, 298–299 (1997)). TAMUK is not an individual person under *Ex parte Young*, and Plaintiff's allegations as to the Defendant Hussey in his official capacity does not meet the requirements of *Ex parte Young* because he has not pleaded a claim for prospective relief and he cannot demonstrate an ongoing violation of federal law.

*Ex parte Young* does not apply to this case because—Plaintiff's failure, as explained elsewhere, to plead facts giving rise to the plausible inference that any federal law has been violated aside—the relief Doe requests is retrospective in nature, not prospective.

Plaintiff characterizes his request for injunctive relief as "seek[ing] to enjoin [TAMUK] from *effectuating* its decision to expel Plaintiff," dkt 1-2 at 8-9 n.15 (emphasis added), and, elsewhere, as "seek[ing] an injunction that prohibits Defendant from *instituting* expulsion against Doe," dkt 1-2 at pg 27 (emphasis added). But Doe's Complaint

admits that, as of the date of its filing, he *had already been expelled*—and it does so *no less than seven* times:

- "On, October 6, 2021, Doe was expelled from the University," dkt 1-2 ¶ 24;
- "the expulsion of Doe . . . *was* inappropriate," *id*. at ¶ 23 (emphasis added);
- "three weeks after the final hearing, Doe received email correspondence . . . that his sanction is expulsion," *id*. at ¶ 55;
- "Defendant breached its contract with Doe . . . which resulted in his expulsion," *id*. at ¶ 104;
- "The hearing officer . . . expelled him from the University," *id*. at ¶7;
- "Doe was . . . expelled," *id*. at ¶ 31; and
- "Defendant expelled Plaintiff," *id*. at ¶ 90.

Given that, it is difficult to see what injunctive relief, exactly, Doe is requesting—he admits that he has already been expelled. It cannot, at any rate, be for prospective injunctive relief, as the expulsion, by Doe's own admission, is done, and Doe's appeal of it denied, and both of these occurred prior to Doe filing his suit. Thus Doe's request for an injunction enjoining his expulsion is, as a practical matter, a request to undo the decision to expel him and as such a request for retroactive relief—not for an order enjoining an ongoing violation of federal law.

If that is what Doe wants—for this Court to enter a declaration regarding his allegations of past misconduct, i.e. a declaration that Doe's having been "expelled," see supra—the *Ex Parte Young* exception does not help him: the *Ex parte Young* doctrine does not permit declarations regarding past conduct. *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) ("[T]he [*Young*] exception is narrow: It applies only to prospective relief, [and] does not permit judgments against state officers

declaring that they violated federal law in the past."). Doe does not allege any "ongoing violation of federal law" as necessary to invoke the *Young* doctrine. *See Spec's Family Partners, Ltd. v. Nettles*, 972 F.3d 671, 681 (5th Cir. 2020) (citing *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011)).

### 2. Sovereign immunity bars Doe's breach of contract claim against Defendants

As explained above, the Eleventh Amendment to the United States Constitution bars an individual from suing a state in federal court unless the state consents to suit or Congress has clearly and validly abrogated the state's sovereign immunity. *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999). That is no less true of breach of contract claims, which require express consent to suit by the Texas legislature. *See McWhinney v. Prairie View A&M Univ., No. CIV.A. H-05-3927*, 2006 WL 2253456, at *3 (S.D. Tex. Aug. 7, 2006) ("Under Texas law, the State of Texas and its governmental units are immune from suit for breach of contract claims absent express legislative consent"); *see also Jackson v. Texas S. Univ.*, 997 F. Supp. 2d 613, 648 (S.D. Tex. 2014) ("since she lacks legislative consent to sue an arm of the state of Texas, sovereign immunity from suit also bars any possible contract and quasi-contract claims" against the university"). "The burden of showing [that] consent to suit rests with the plaintiff." *La Blanche v. Prairie View A & M Univ., No. CIV.A. H-06-1540*, 2006 WL 3488926, at *1 (S.D. Tex. Dec. 4, 2006). Doe has not alleged that that the Texas Legislature has consented to suit for breach of contract claims, nor can he.  And the *Ex Parte Young* exception does not

apply because, inter alia, Doe seeks damages, not prospective injunctive relief, for his breach of contract claim. *Cf. Yul Chu v. Mississippi State Univ.*, 901 F. Supp. 2d 761, 775 (N.D. Miss. 2012), aff'd, 592 F. App'x 260 (5th Cir. 2014) ("*Ex parte Young* . . . does not allow injunctive relief requiring a state official to conform his future conduct to state law. Plaintiff's breach of contract claim for monetary relief is similarly barred.").

### 3. Sovereign immunity bars Doe's negligence claim against Defendants

Similarly, sovereign immunity bars Doe's negligence claim unless TAMUK has waived immunity from such a cause of action. Doe points to no waiver, nor can he. This is because, while "[the] T[exas] T[orts] C[laim] A[ct] 'creates a limited waiver of sovereign immunity,'" it only provides waivers for negligence-based torts in three cases: a government employee's operation or use of motor driven equipment; a condition or use of tangible personal property; and a condition or use of real property. *See Goodman v. Harris Cty.*, 571 F.3d 388, 394 (5th Cir. 2009); CPRC 101.021. Doe alleges no such injury. And the *Ex Parte Young* exception does not apply because, inter alia, Doe does not seek prospective injunctive relief for his negligence claim, but instead damages. Cf. *Yul Chu*, 901 F. Supp. at 775.

## II.   MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

### A.   Standard of Review

Federal Rule of Civil Procedure 12(b)(6) governs motions to dismiss for failure to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). To avoid dismissal under Rule 12(b)(6), a plaintiff must plead sufficient facts to "state a claim to

relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. While courts must accept all factual allegations as true, they "do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005); *see also Iqbal*, 556 U.S. at 679. The Court may consider (1) the complaint; (2) the complaint's attachments; (3) a defendant's attachments that were referenced in the complaint and central to the plaintiff's claim; and (4) matters on which a court may take judicial notice. *See, e.g.*, *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000); *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994). "[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007).

Notably, "[p]leadings" for purposes of a Rule 12(b)(6) motion include attachments to the complaint. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). Thus, the exhibits to his Complaint that Doe filed under seal[8] are properly referenced in the Rule 12(b)(6) portion of this motion.

---

[8] Dkts 10-13, Plaintiff's Exhibits 1-4.

**B.**     **Arguments & Authorities**

**1.**   **Doe fails to plead facts sufficient to state a claim for violation of his 14th Amendment due process rights under §1983 against Defendants—Doe received all the process he was due and more**

As explained above in the 12(b)(1) section, the Court does not possess subject matter jurisdiction over Plaintiff's due process claim because sovereign immunity bars that claim against Defendants and the *Ex Parte Young* exception does not apply.  But even if that were not the case, Doe fails to plead facts giving rise to the plausible inference that TAMUK's procedures did violated his due process rights. The Court should, accordingly, dismiss under Rule 12(b)(6).

Plaintiff claims that TAMUK violated his due process rights when it, allegedly:

- o took the accusations against Doe as true and put the burden on him to disprove them;

- o disallowed Doe an extension of time for his attorney—whom he alleges he "secur[ed] . . . immediately before the hearing," dkt 1-2 at ¶19(2), despite Doe's having been on notice of that hearing for weeks—to consult with experts, consult further with Doe, and gather evidence from the law enforcement investigation into Doe for the same sexual assault;

- o prevented Doe from presenting new evidence during the hearing;

- o failed to provide both Doe and the hearing panel with the recorded statements that formed the basis of the testimony summaries in the TAMUK investigators' reports;

- o included Doe's statement, allegedly inaccurate in a way the Complaint fails to specify but which Doe alleges he at some point relayed to TAMUK, into the evidentiary record;

- o prevented Doe's counsel from making all the objections, argument,

and questions he wanted to during the hearing, including ones going to Jane Roe's character regarding her alcohol consumption and sexual proclivities.

*See, e.g.*, dkt 1-2 ¶ 19(1)-(11). None of these allegations, nor any of Doe's related complaints about TAMUK's investigation, hearing, and treatment of his appeal, pleads sufficient facts to raise the plausible inference that Doe's due process rights were violated.

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotation marks omitted). Plaintiff had a live hearing that lasted over five hours. At the hearing, he was supported by an advisor—in this case, his attorney—who was allowed to ask questions of the opposing party and witnesses on his behalf.[9] The two investigators were also present at the hearing and subject to cross-examination. There is no requirement under due process that a student be granted unfettered control over the investigation or unfettered cross examination by his counsel at a live hearing. On the contrary, federal law prescribes that limits be placed on the parties and their advisors: respondents are provided the right to review all evidence collected in the investigatory process, and advisors may ask questions of opposing parties and witnesses, but the relevancy of all questions must be ruled on by the chair. *See* 34 C.F.R. § 106.45. And Doe admits his attorney was permitted to ask questions during the hearing, just not engage in

---

[9] Strictly speaking, students represent themselves in the process.

what he terms "true cross-examination and attorney advocacy," dkt 1-2 ¶ 56—or the application of a standard other than preponderance of the evidence.

Likewise, the due process clause does not compel perfection when universities adjudicate misconduct. "In addition, we are careful to admonish that the due course of law guarantee, like the due process clause, does not ensure that the academic disciplinary process is accurate and without error; it merely guards against the risk of unfair dismissal or suspension if that may be accomplished without prohibitive cost or interference with the educational process." *See Nash v. Auburn University*, 812 F.2d 655, 661 (11th Cir. 1987) (citing *Goss v. Lopez*, 419 U.S. 565, 579–80 (1975)); *Univ. of Tex. Med. Sch. at Houston v. Than*, 901 S.W.2d 926, 931 (Tex. 1995). TAMUK, pursuant to federal law, its rules, and procedures, provided Plaintiff with a high-level of due process—substantially more than the minimums required by law.

Relatedly, "the amount of process due in university disciplinary proceedings is based on a sliding scale that considers three factors: (a) the student's interests that will be affected; (b) the risk of an erroneous deprivation of such interests through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (c) the university's interests, including the burden that additional procedures would entail." *Plummer*, 860 F.3d at 773. Here, Plaintiff has a liberty interest in higher education. *Id.* (citing *Univ. of Tex. Med. Sch. at Hous. v. Than*, 901 S.W.2d 926, 929–30 (Tex. 1995) (recognizing a liberty interest in graduate higher education under the Texas Constitution)). Against that, however, TAMUK possesses "a strong interest in the

21

'educational process,' including maintaining a safe learning environment for all its students, while preserving its limited administrative resources." *See id.; Walsh v. Hodge*, 975 F.3d 475, 484 (5th Cir. 2020) (recognizing the interest in "preserving the University's resources to serve its primary function of education" and "providing a safe environment for other members of the faculty and student body" in the context of a professor accused of sexual harassment).

TAMUK also possesses a strong interest in preserving the integrity of its Title IX process. Having a student who that process found responsible for sexual assault and expelled remain on campus would vitiate that process—including undercutting its serving as a disincentive to other would-be perpetrators of sexual assault.

Sexual assault, further, is clearly inconsistent with TAMUK's "maintaining a safe learning environment for all its students." And in Doe's case, this consideration goes beyond his presence at TAMUK posing an ongoing threat, physical and/or emotional, to Jane Roe. This is because Doe's actions *as described in his very own Complaint* embody behaviors indicative of intent, and possibly predation, according to TAMUK's policies and procedures,[10] as does his attitude to Roe as a possibly premeditated, but random, victim: Doe met Roe on Twitter, which is a messaging service, not a dating app, and he found and messaged her there; Doe only met Roe once in person before sexually assaulting her, and that was to buy her—under 21 at the time, a fact of which Doe was

---

[10] Section 08.01.01 of TAMUK's Civil Rights Compliance policy defines "[p]redation [as] an intent to engage in acts of misconduct prior to their occurrence demonstrating premeditation, planning or forethought…." Dkt 10 Plaintiff's Ex. 1 at 26.

aware—alcohol. *See* dkt 10 Plaintiff's Ex. 1 at 4. Doe sexually assaulted Roe after, by his

own admission, plying her with alcohol, and Doe admits that Roe left the bedroom to

vomit in the bathroom immediately after the sexual encounter.[11] Viewed relative to

TAMUK's interests in play, including sparing its entire female student body—not just

Roe—the risk of possibly premeditated sexual assault, given Doe's behaviors' indication

of intent and possibly predation, Doe, on the sliding scale, certainly got more due process

than he was due.

**2. Doe fails to plead facts sufficient to state a Title IX erroneous outcome claim against Defendants—Doe fails to plead specific facts to give rise to the plausible inference that TAMUK's finding of responsibility was an erroneous outcome and that gender bias caused that outcome**

To succeed on the erroneous outcome theory, Plaintiff must show a causal

connection between the flawed outcome and gender bias. *Klocke v. University of Texas at

Arlington*, 938 F.3d 204, 210 (2019), cert. denied, 140 S. Ct. 1268, 206 L. Ed. 2d 256

(2020); *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994). The *Yusuf* court noted

that a Plaintiff might allege "particular evidentiary weaknesses behind the finding of an

offense such as a motive to lie on the part of a complainant," or "particularized strengths

of the defense," or "particular procedural flaws affecting the proof." *Id*. "Plaintiffs who

claim that an erroneous outcome was reached must allege particular facts sufficient to

cast some articulable doubt on the accuracy of the outcome of the disciplinary

---

[11] The testimony in the investigation report Doe takes issue with tells an even more horrific story. *See* dkt 10 Plaintiff's Ex. 1 at 5 (Jane Roe testifying that Doe physically forced her to have anal and oral sex, and one of Jane Roe's outcry witnesses testifying that Jane Roe told her the same).

proceeding." *Yusuf*, 35 F.3d at 715. Doe fails to do either; the Complaint here lacks factual allegations that would raise such a doubt.

### a.  Erroneous Outcome

The Complaint lacks any particularized facts demonstrating that Plaintiff is innocent and wrongly held responsible for sexual assault. Plaintiff's factual allegations in support of his innocence are three-fold: (1) Roe could not possibly have been sufficiently intoxicated from alcohol to be incapacitated/incapable of consenting to sex with Doe, dkt 1-2 ¶ 27; (2) TAMUK's means of calculating the amount of alcohol Roe drank was flawed and did not comport with the testimony, *id.* ¶ 29; (3) that officials failed to make a finding that Roe was incapacitated *id.* ¶ 24; (4) that no evidence was presented that Roe's "alleged 'incapability of providing consent' was readily apparent to Doe," *id.* None of these allegations gives rise to the plausible inference that TAMUK reached an erroneous outcome in finding Doe responsible for sexual assault.

*The possibility of Roe being incapacitated from alcohol*. Plaintiff's Complaint's very own allegations dismisses this theory of innocence: Doe pleads that Roe went to the bathroom and vomited immediately after the two had sex in Doe's bedroom, and Doe does not deny that alcohol was the cause of the vomiting or plead an alternative explanation.

*TAMUK's calculation of Roe's blood alcohol level and its consistency with the hearing testimony*. If anything, the hearing testimony—which includes Roe's testimony that she vomited at least four times, once before the sexual assault by Doe and three times after,

together with her two outcry witnesses' testimonies that Roe vomited in the parking lot
when they picked her up and again in the car, as well as testimony from all three that Roe
was slurring her speech, Dkt 10 Plaintiff's Ex. 1 at 4-6—indicates that, if anything,
TAMUK's blood alcohol content estimate for Roe drastically understated it.

     *That officials failed to make a finding that Roe was incapacitated*. This is simply
inaccurate: the October 6, 2021 outcome letter sent to Doe clearly states that "[t]he level
of intoxication of the complainant made her incapable of providing consent, and the
respondent knew or reasonably should have known about the complainant's inability to
provide consent." *See* dkt 11 Plaintiff's Ex. 2 at 2.

     *That no evidence was presented that Roe's "alleged 'incapability of providing consent'*
*was readily apparent to Doe*. This is grotesquely inaccurate: apart from the testimonies of
Roe and her two outcry witnesses, related above, which clearly provide evidence of an
incapacity that would have been "readily apparent to Doe," Doe himself admits in his
Complaint that Roe vomited right after they had sex—and provides no alternative
explanation other than alcohol. *See* dkt 1-2 ¶ 17.

     In sum, Plaintiff fails to sufficiently allege facts that plausibly establish Plaintiff is
innocent.

### b.  Gender Bias Motivating Erroneous Outcome

     Nor can Plaintiff show that gender bias motivated the hearing officer's finding of
responsibility. Even assuming that Plaintiff could succeed on the first element of an
erroneous outcome claim, he fails to plausibly allege the second element—that the

hearing officer's decision was motivated by gender bias.

Plaintiff's primary contention in this connection is that the TAMUK and the Title

IX Office:

> either in compliance with official mandates to "crack down" on those accused of sexual misconduct and/or in an effort to appease the "me too" movement and supporters of same (as opposed to the more constitutional "deciding a case on the individual facts movement"), the Title IX Coordinator, investigators (in particular), and decision-makers (who do not even issue their own opinion or decision) had a bias for Roe and against Doe, and that such bias permeated the investigation, the allowed (and disallowed) evidence which significantly impaired the decision making and resulted in an erroneous outcome.

Dkt. 1-2 at ¶22.

These allegations are conclusory and without specific evidence, which the

Complaint nowhere provides, and are insufficient to succeed on an erroneous outcome

claim. Plaintiff must plausibly allege that Defendants "discriminated against him …

because of sex; that the discrimination was intentional; and that the discrimination was a

'substantial' or 'motivating factor' for the [university's] actions." *Doe v. Western New*

*England Univ.*, 228 F. Supp. 3d 154, 187 (W.D. Mass. 2017) (emphasis in original). He

may point to "statements by members of the disciplinary tribunal, statements by

pertinent university officials, or patterns of decision-making that also tend to show the

influence of gender" or "statements reflecting bias by members of the tribunal." *Yusuf*,

35 F.3d at 715. He does not.

Generalized pressures to address sexual harassment on campus, without specific

allegations of irregularities in the investigation process or statements by participants in

the decision-making, are not enough to find liability under Title IX. *See e.g., Doe v. Cummins*, 662 F. App'x. 437, 452–53 (6th Cir. 2016) (holding that general allegations "that the Department of Education's 'Dear Colleague Letter' induced [the University] to discriminate against males in sexual-assault investigations in order to preserve federal funding," "without more, is insufficient to create a plausible claim of gender bias under Title IX."); *see also Doe v. Univ. of Denver*, 952 F.3d 1192 (10th Cir. 2020 (Doe 1) ("although evidence of the DCL and external pressure placed on the school to conform with its guidance may provide the plaintiff with a story about why might have been motivated to discriminate against males accused of sexual assault, such evidence is insufficient in itself to support any inference that the school's actions in a particular case were motivated at least in part by gender bias") (cleaned up); *Doe v. Univ. of Denver*, 2021 WL 2426199 at 831(10th Cir. 2021) ("If true, this type of explanation [that "University employees were biased against sexual-misconduct respondents, regardless of their sex"]—though at odds with general notions of due process—would not expose the University to Title IX liability, because respondent and complainant are (at least in the abstract) sex-neutral classifications."); *Doe v. University of South Alabama, No. CV 17-0394-CG-C*, 2020 WL 759895 (S.D. Ala. Feb. 14, 2020) ("Absent university-specific allegations of community pressure, allegations of a national bias against males based on the letter have been found insufficient to support an inference of gender bias."); *Doe v. Washington Univ.*, 434 F. Supp. 3d 735 (E.D. Mo. 2020), reconsideration denied, No. 4:19 CV 300 (JMB), 2020 WL 1308209 (E.D. Mo. March 19, 2020) (When courts consider

allegations of external pressure in a Title IX erroneous outcome claim, they look to see if a plaintiff has alleged facts demonstrating that it was pressured not only to aggressively pursue sexual assault cases, but to do so in a manner biased against males, thus allegations of public criticism of the university as well and awareness of that criticism by University officials were insufficient); *Doe v. Loh, CV PX-16-3314*, 2018 WL 1535495, at *9 (D. Md. Mar. 29, 2018),  aff'd, 767 F. App'x 489 (4th Cir. 2019) (holding that allegation of "general pressure that the Dear Colleague letter supposedly exerted on all universities does not allow the inference that UMCP succumbed to such pressure, and that the pressure rendered a biased outcome in Doe's case."); *Doe v. Univ. of Cincinnati*, No. 1:16CV987, 2018 WL 1521631, at *6 (S.D. Ohio Mar. 28, 2018) ("In the cases where public pressure was found to support claims of erroneous outcome, that public pressure targeted the specific disciplinary action being challenged."); *Ruff v. Bd. of Regents of Univ. of N.M.*, 272 F. Supp. 3d 1289, 1296–97 (D.N.M. 2017) (stating that male college student failed to allege facts demonstrating that outside pressure in the form of a actually influenced the University's pursuit of the sexual assault case in a gender-biased manner rather than because of the serious nature of the female student's allegations); *Doe v. Univ. of Colo.*, *Boulder*, 255 F. Supp. 3d 1064, 1078 (D. Colo. 2017) (concluding that allegations, including that "the University was, at the time of the allegations against [the plaintiff], subject to a Department of Education investigation into the University's handling of sexual violence and sexual harassment complaints" and that the investigation "motivated Defendants to handle the case against Plaintiff more aggressively, and to protect the

28

reputation and financial well-being of [the University]" were conclusory and insufficient to allow an inference of gender bias; the various plaintiffs′ allegations largely tend to show, if anything, pro-victim bias, which does not equate to anti-male bias"); *Doe v. Coll. of Wooster*, 243 F. Supp. 3d 875, 886 (N.D. Ohio 2017) (determining that public criticism of the College did not suggest an adequate basis for gender bias and that the fact that the College was seeking to comply with federal regulation was not an indication of gender bias); *Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 992 (D. Minn. 2017) ("[T]his Court joins the majority of federal courts in finding a general reference to federal pressure, by itself, is insufficient to show gender bias."); *Doe v. Lynn Univ., Inc.*, 224 F. Supp. 3d 1288, 1342 (S.D. Fla. 2016) (granting Defendant's motion to dismiss because nationwide pressure on universities was not enough to support "the plausible inference of a causal connection between the flawed outcome and gender bias" where Plaintiff did not allege that any such media attention was focused on Defendant or that Defendant′s student body levied any criticism at its handling of sexual misconduct cases).

Plaintiff does not make any particularized allegations that females similarly situated to the Plaintiff are treated any differently by TAMUK. While Plaintiff alleges bias in favor of the victim in this case, that is insufficient to show gender bias. This is because "any bias in favor of the alleged victims…and against the alleged perpetrators, is not the equivalent of demonstrating bias against male students." *Sahm v. Miami Univ.*, 110 F.Supp.3d 774, 778–779 (S.D. Ohio 2015); *King v. DePauw Univ., No. 2:14-CV-70-WTL-DKL*, 2014 WL 4197507, at *10 (S.D. Ind. 2014) (university has no control over the

gender makeup of those who are accused by other students of sexual misconduct and any bias against students accused of sexual assault is not the equivalent of demonstrating a bias against males, even if all of the students accused of assault were male); *Haley v. Va. Com. Univ.*, 948 F. Supp. 573, 579 (E.D. Va. 1996) ("a bias against people accused of sexual harassment and in favor of victims ... indicate[s] nothing about gender discrimination"); *Doe v. Univ. of Mass.–Amherst, No. CV 14-30143-MGM*, 2015 WL 4306521, at *9 (W.D. Mass. 2015) (dismissing Plaintiff's suggestion that bias is evidenced because the decision-maker credited accuser's testimony rather than the accused); *see also Doe v. Univ. of Denver* (10th Cir.), supra (that University employees were biased against sexual-misconduct respondents regardless of their sex would not expose the University to Title IX liability, because respondent and complainant are sex-neutral classifications.).

In sum, a court is not required to accept Plaintiff's conclusions if they "cannot reasonably be drawn from the facts alleged." *Doe v. Univ. of the South*, 687 F.Supp.2d 744, 751 (E.D. Tenn. 2009) (emphasis added). Moreover, there is a presumption of honesty and integrity in those serving as adjudicators. *Pham v. Univ. of Louisiana at Monroe*, 194 F. Supp. 3d 534, 544 (W.D. La. 2016), aff'd sub nom. *Dung Quoc Pham v. Blaylock*, 712 F. App'x 360 (5th Cir. 2017); *see also Bleiler v. Coll. of Holy Cross, No. CIV.A. 11-11541-DJC*, 2013 WL 4714340, at *13 (D. Mass. 2013) ("alleged prejudice of university hearing bodies must be based upon more than mere speculation and tenuous inferences"). Plaintiff does not allege any statements or actions by the investigative or hearing officers, either before, during, or after the hearing, that plausibly show a bias against, or hostility toward males.

*See Doe v. West. New England Univ.*, 228 F. Supp. 3d 154, 189 (granting dismissal of Title IX claim where complaint lacked any statements by pertinent university employees demonstrating gender bias).

In sum, Plaintiff's claim of erroneous outcome is not viable and should be dismissed under Rule 12(b)(6).

> **3. Doe fails to plead facts sufficient to state a Title IX selective enforcement claim against Defendants—Doe fails to plead specific facts to give rise to the plausible inference that gender bias affected the decision to initiate the disciplinary proceedings and/or the severity of his punishment**

To succeed on a selective enforcement theory, Plaintiff must show that regardless of his guilt or innocence, the decision to initiate the disciplinary proceedings against him and/or the severity of his punishment was affected by his gender. *See Klocke*; *Yusuf*, 35 F.3d at 715. In other words, Plaintiff must plead that "a female was in circumstances sufficiently similar" to him and that the female was treated more favorably. *See Doe v. Univ. of the South*, 687 F. Supp. 2d at 756. Plaintiff must "demonstrate[] selective enforcement through the identification of a comparator of the opposite sex who was treated more favorably by the educational institution when facing similar disciplinary charges." *See Doe v. Case Western Reserve Univ., No. 14-2044*, 2015 WL 5522001, *at 6 (N.D. Ohio Sept. 16, 2015). The comparator cannot be the person who accused the plaintiff. *Id*.

But here, Plaintiff has not pointed to any facts that show his gender was a motivating factor in Defendant's decision to initiate the investigation or in the severity of the penalties. Plaintiff's arguments appear to focus on the investigation and adjudication. This is because

the investigation was initiated by the female student filing of a formal complaint. *See Doe v. University of Texas at Austin, No. 1:18-CV-85-RP*, Dkt. 30 (W.D. Tex. May 15, 2018) (concluding that plaintiff student could not show a likelihood of success on Title IX selective-enforcement claim because a student filed the complaint). And, though Doe objects to the severity of the sanction, its severity was a function of TAMUK's precedence in sanctioning and of the potential foreseeable risk, as provided for in the controlling TAMUK regulation. *See* Texas A&M System regulation 08.01.01, Appendix A Model Sanctioning Matrix for sexual violence[12] at 1 ("Sanctioning Considerations … Does the respondent represent a foreseeable risk of harm to others?"). That is, Doe's actions and attitudes—his use of alcohol, his victim seemingly chosen at random off the Internet, which give indication of intent, possibly predation—indicated a foreseeability of his potential future behavior, which represented a potential threat of harm to all members of the university community. Thus, expulsion was appropriate, and it is consistent with the sanctioning matrix used in the panel's sanctioning decision. *See id.*

Plaintiff has also not plausibly alleged that any female in circumstances similar to his was treated more favorably. *See Gudgel v. Del Mar Coll., No. 2:16-CV-513*, 2018 WL 472829, at *2 (S.D. Tex. Jan. 17, 2018). He also has not alleged that a female accused of sexual assault would not have been subjected to the same disciplinary procedures and sanctions. In fact, the Complaint does not include any allegations at all pertaining to a female in nearly

---

[12] Texas A&M System regulation 08.01.01, Appendix A Model Sanctioning Matrix for Sexual Violence, Sexual Harassment, and Sex-based Misconduct by Students in the Texas A&M University System, https://assets.system.tamus.edu/files/policy/pdf/08-01-01-Appendix.pdf (November 30, 2021).

identical circumstances to Plaintiff. *See Lee v. Kansas City S. Ry.*, 574 F.3d 253, 259-60 (5th Cir. 2009) (Discussing Fifth Circuit's requirement that a comparator be in "nearly identical circumstances.").

Plaintiff's allegation that the Jane Roe has received more favorable treatment are also insufficient. As previously discussed, an alleged bias in favor of the complainant does not equate gender bias simply because many of the complainants are female. *See Doe v. Trustees of Boston College*, 892 F.3d 67, 91-92 (1st Cir. 2018) (upholding summary judgment on Title IX claim where 10 years of data demonstrate that only males were accused of sexual assault and noting that "The gender of the students accused of sexual assault is the result of what is reported to the University, not the other way around."); *Doe v. Univ. of Denver* (10th Cir.), supra (that University employees were biased against sexual-misconduct respondents regardless of their sex would not expose the University to Title IX liability, because respondent and complainant are sex-neutral classifications.); *King*, 2014 WL 4197507 at *10 (university has no control over gender makeup of those who are accused by other students of sexual misconduct).

For these reasons, Plaintiff's selective enforcement theory is also not viable, and Plaintiff's claim should be dismissed under Rule 12(b)(6).

### III.   DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### A.   Standard of Review

"[A] preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements." *PCI Transp., Inc. v. Fort Worth & W. R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005). An applicant for a preliminary injunction must establish four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the temporary restraining order is denied; (3) that the threatened injury outweighs any damage that the temporary restraining order might cause the defendant; and (4) that the temporary restraining order will not disserve the public interest. *Currier*, 760 F.3d at 452 (quoting *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998)); *PCI Transp., Inc. v. Fort Worth & W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005).

An injunction should not be granted unless the movant "has clearly carried the burden of persuasion on all four requirements." *Planned Parenthood Ass'n of Hidalgo Cnty., Tex., Inc. v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012) (emphasis added). This is particularly true when a party seeks an order directing state officials to perform or discontinue certain conduct. *Morrow v. Harwell*, 768 F.2d 619, 627 (5th Cir. 1985). And, pertinent here, "[m]andatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Matthews*, 544 F.2d 1233, 1243 (5th Cir. 1976); *see also Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971) ("[W]hen a plaintiff applies for a mandatory preliminary injunction, such relief

'should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party.'") (citation omitted).

## B.   Arguments & Authorities

### 1.   Plaintiff has not shown a substantial likelihood of success on the merits

As explained above, each of Doe's claims is either barred by TAMUK's sovereign immunity or has facts insufficient to state a claim pled in support of it—or both. Because all of Doe's claims should be dismissed under Rule 12(b)(6), Rule 12(b)(1), or both, Doe has failed to show a substantial likelihood of success on the merits.

### 2.   Plaintiff has not shown a substantial threat of irreparable injury

A harm is irreparable where there is no adequate remedy at law, such as monetary damages. *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). A showing of a speculative injury is not sufficient; there must be more than an unfounded fear. *Id.* (citing *Carter v. Heard*, 593 F.2d 10,12 (5th Cir. 1979)). In this case, Plaintiff argues that he will suffer irreparable harm if a preliminary injunction is not granted, because "he will no longer be a student at the University;" "[the] Title IX finding . . . will blemish Plaintiff's academic transcript or record;" he "will . . . suffer irreparable reputational damage;" he will be "unable to continue his coursework at the University and will no longer be considered a student, let alone a student in good standing.;" his "status as a student [will be revoked] entirely [and] [s]uch expulsion will be noted on Doe's academic transcript and prevent Doe from formally representing the University;" and that the "expulsion will effectively end

Doe's opportunity to graduate from college" since it is "highly unlikely that any university will admit Doe as a student." *See* dkt 3 at 1, 5.

A number of considerations militate against the viability of these alleged irreparable harms being redressable by the injunction Doe seeks.

First, many are not redressable. As explained above, Doe has been expelled; that this has not, in Doe's words, been "effectuated" has no bearing on the Title IX sexual assault finding or expulsion going on Doe's transcript and whatever reputational injury or inability to represent TAMUK may follow from that. These are not threatened irreparable injuries, they have already happened, and so Doe's request for an injunction to address them is moot.  Moreover, if Plaintiff were to succeed on the merits in this litigation, the alleged reputational harm is compensable. And, because Doe could possibly continue his education at a different university—he transferred to TAMUK from a college in California, after all— the issue of Doe graduating from college is more a matter of delay than of end. And, courts have found, such delay is compensable in damages.

Numerous cases have held that a delay in completing one's education is not irreparable injury since it can be compensated through money—and, specifically in the expulsion context, the plaintiff, in order to show his injury is irreparable, must specifically show how monetary damages will not adequately compensate him. *See Caiola v. Saddlemire, No. 3:12-CV-00624 VLB*, 2013 WL 1310002, at *2 (D. Conn. Mar. 27, 2013) (rejecting plaintiff's claim that stigma of expulsion could interfere with his career as "speculative" and noting that "[i]n order to demonstrate that he will suffer irreparable injury, plaintiff

must show that a monetary award will not adequately compensate him for his injuries"); *Doe v. Princeton Univ.*, *No. 3:20-CV-4352-BRM-TJB*, 2020 WL 2097991, at \*7 (D.N.J. May 1, 2020) (a delay in education can be remedied through monetary compensation); *Madej v. Yale Univ.*, No. 3:20-CV-133 (JCH), 2020 WL 1614230, at \*6–7 (D. Conn. Mar. 31, 2020) (academic withdrawal does not mean plaintiff will never be able to obtain his degree; rather, his ability to do so will be delayed, which can be remedied through monetary compensation; reputational harm assertions are "too speculative to warrant injunctive relief"); *Doe v. Vassar Coll.*, *No. 19-CV-9601 (NSR)*, 2019 WL 622291 2019 WL 6222918, at \*6 (S.D.N.Y. Nov. 21, 2019) (finding no irreparable harm where plaintiff claimed he would "lose the ability to play college soccer"); *Roden v. Floyd*, *No. 2:16-CV-11208*, 2018 WL 6816162, at \*5 (E.D. Mich. Nov. 13, 2018), report and recommendation adopted, 2018 WL 6815620 (E.D. Mich. Dec. 27, 2018) (if plaintiff ultimately prevails on the merits of his underlying claims and is reinstated, he will have suffered a delay in his education, but delays in education do not constitute irreparable harm); *Montague v. Yale Univ.*, *No. 3:16-CV-00885(AVC)*, 2017 WL 4942772, at \*3–4 (D. Conn. Mar. 8, 2017) (harm from the delay in completing education and possibility of decreased employment opportunities are quantifiable and can be adequately remedied by money damages); *Knoch v. Univ. of Pittsburgh, No. 2:16-CV-00970-CRE*, 2016 WL 4570755, at \*8–9 (W.D. Pa. Aug. 31, 2016) (any interruption of education and delay in entering the workforce can adequately be compensated by monetary damages should plaintiff succeed on the merits of his claims); *Howe v. Pennsylvania State Univ. – Harrisburg, No. CV 1:16-0102*, 2016 WL 393717, at \*6

(M.D. Pa. Feb. 2, 2016) appeal dismissed (Mar. 29, 2016) ("[T]he court finds that even if the plaintiff would experience a delay . . .this would not constitute irreparable harm which would not be compensated with monetary damages in the future, if warranted."); *Mahmood v. Nat'l Bd. of Med. Examiners, No. CIV.A. 12-1544*, 2012 WL 2368462, at *5 (E.D. Pa. June 21, 2012) (collecting cases stating that delays in education services do not constitute irreparable harm); *Oser v. Capital Univ. Law Sch.*, No. 2:09-CV-709, 2009 WL 2913919, at *11 (S.D. Ohio Sept. 8, 2009) (noting that plaintiff had "no general right to attend law school" and that he will not be irreparably harmed by "[a]ny delay in his degree conferral" if he should ultimately succeed on his claim); *Marsh v. Delaware State Univ., No. CIV.A. 05-00087JJF*, 2006 WL 141680, at *6 (D. Del. Jan. 19, 2006) (delay in education does not amount to irreparable harm); *Baer v. Nat'l Bd. of Med. Examiners*, 392 F. Supp. 2d 42, 49 (D. Mass. 2005) (inability to continue as a medical student without interruption is not a harm that is irreparable to Baer's potential medical career); *Phillips v. Marsh*, 687 F. 2d 620 (2d Cir. 1982) ("We can conceive of no irreparable harm that would accrue to [the plaintiff] in allowing her graduation to await the outcome of the trial on the merits; any damages to her from deferring her career as a military officer in that period of time would surely be compensable by monetary damages.").

As these cases show, a delay to allow resolution of this matter on the merits will not cause irreparable injury. Moreover, this finding alone is sufficient for this Court to deny the motion for a preliminary injunction. *See DFW Metro Line Servs. v. Sw. Bell Tel. Co.*, 901 F.2d 1267, 1269 (5th Cir. 1990) (per curiam) (affirming denial of preliminary injunctive

relief on ground that movant had failed to show irreparable injury, and pretermitting discussion of other three factors).

Most importantly, preservation of the status quo will hardly help Doe: as noted, many of the alleged irreparable harms Doe enumerates—reputational, a blight on his transcript, "his academic records . . . reflect[ing] his expulsion, handicapping his ability to be accepted at a transfer school or graduate school or to secure his desired employment," dkt 1-2 ¶ 120—will exist whether or not his already decided expulsion is "effectuated." With respect to those harms, harms Doe alleges he will experience absent an injunction, Doe's request for injunctive relief is moot: they will exist whether or not his expulsion is "effectuated."

### 3. Doe has not shown the threatened injury outweighs any damage that the preliminary injunction might cause TAMUK

As explained above in the section treating Doe's due process claim, having Doe—whose actions vis-à-vis Roe give indication of intent, possibly predation—on TAMUK's campus poses a threat to all TAMUK's female students. Also posing a threat to all TAMUK's female students, would, as explained above, be the violence to the integrity of TAMUK's Title IX process that would result if it were to, after the full gamut of the investigation, hearing, and appeals process were run, allow a student found responsible for sexual assault and expelled to remain a student. Against that, as explained above, many of the harms Doe alleges he will experience absent an injunction will simply not be affected by the injunction stopping the "effectuation" of his already decided expulsion.

Thus, Doe has not and cannot show that his threatened injury outweighs the damage the preliminary injunction might cause TAMUK.

### 4. The public interest factors counsel against an injunction

TAMUK is a public institution funded by public dollars administered by public servants serving the public good by educating Texas youth. The public has a compelling interest in eradicating sex discrimination in education and sexual misconduct between students. In addition, Universities have great latitude in administering their rules and regulations as courts recognize that the institutions' primary responsibility is to provide a safe learning environment for all its students. *See Goss*, 419 U.S. at 580; *see also Gorman v. Univ. of Rhode Island*, 837 F.2d 7, 14–15 (1st Cir. 1988) ("Although the protection of [a student's private interest] would require all possible safeguards,  it must be balanced against the need to promote and protect the primary function of institutions that exist to provide education."); *Am. Future Sys., Inc. v. Penn. State Univ.*, 752 F.2d 854, 865 (3d Cir.1984) ("There can be no doubt that a public university has a significant interest in carrying out its educational mission"). Because the Plaintiff cannot show a substantial likelihood of success on the merits of his due process and Title IX claims, the public interest demands allowing the TAMUK's sanctions to stand pending a decision on Plaintiff's motion for a Preliminary Injunction and adjudication of the claims on the merits.

## IV.   PRAYER

For the above reasons, Defendants ask the Court to (1) deny Plaintiff's motion for temporary restraining order and preliminary injunction [dkt 3] and (2) dismiss all Plaintiff's claims, as presented in Plaintiff's Complaint [dkt 1-2], against Defendants in their entirety.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

SHAWN COWLES
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief for General Litigation Division

*/s/ Benjamin S. Lyles*
BENJAMIN STOREY LYLES
Texas Bar No. 24094808
Attorney-in-charge
Southern District ID. 3062156
Assistant Attorney General
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, TX 78711-2548
(512) 463-2798 PHONE
(512) 320-0667 FAX
Benjamin.Lyles@oag.texas.gov

ATTORNEYS FOR DEFENDANTS

<u>**CERTIFICATE OF SERVICE**</u>

I certify that that on November 30, 2021, this document was filed electronically via the Court's CM/ECF system, causing electronic service upon all counsel of record.

*/s/ Benjamin S. Lyles*
BENJAMIN STOREY LYLES
Assistant Attorney General